[Cite as *In re I.W.*, 2017-Ohio-8495.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| IN RE: I.W., A.W., JR. and S.W. | : | |
| | : | |
| | : | Appellate Case Nos. |
| | : | 27617/27618/27619/27624 |
| | : | |
| | : | Trial Court Case Nos. 2013-2559/2013- |
| | : | 2560/2014-5075 |
| | : | |
| | : | (Appeal from Common Pleas Court- |
| | : | Juvenile Division) |

. . . . . . . . . .

O P I N I O N

Rendered on the 9th day of November, 2017.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ALICE B. PETERS, Atty. Reg. No. 0093945, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Appellee-Montgomery County Children Services

JENNIFER S. GETTY, Atty. Reg. No. 0074317, 7501 Paragon Road, Centerville, Ohio 45459
        Attorney for Appellant-T.W.

NICOLE RUTTER-HIRTH, Atty. Reg. No. 0081004, 2541 Shiloh Springs Road, Trotwood, Ohio 45426
        Attorney for Appellant-A.W.

SHIREEN HEBERT, Atty. Reg. No. 0077594, 865 South Dixie Drive, Vandalia, Ohio 45377
        Guardian Ad Litem

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} This matter is before us on the appeal of T.W. and A.W., Sr., who are the biological parents of three minor children, I.W., A.W., Jr., and S.W.[1]  Mother and Father appeal from a judgment terminating their parental rights and awarding permanent custody of the children to the Montgomery County Children's Services ("MCCS").

{¶ 2} Mother contends the decision that the children could not be placed with either parent within a reasonable time was against the manifest weight of the evidence.  In addition, Mother contends that the decision to award permanent custody to MCCS, in the best interest of the children, was against the weight of the evidence.

{¶ 3} Father filed a separate brief, and raises essentially the same two assignments of error.  He also argues, in a third assignment of error, that the court erred in granting permanent custody to MCCS because reasonable efforts would have prevented continued removal.

{¶ 4} We conclude that the trial court did not err in awarding permanent custody of Appellants' three minor children to MCCS.  The court's decision that the children could not be placed with either parent within a reasonable time or should not be placed with either parent was supported by competent, credible evidence.  In addition, the court's decision that a permanent custody award to MCCS was in the children's best interest was supported by competent, credible evidence.  Finally, the court properly concluded that MCCS made reasonable efforts to prevent the continued removal of the children and to

---

[1] To avoid confusion, we will refer to the parents as "Mother" and "Father."

reunify the family. Accordingly, the judgment of the trial court will be affirmed.


I. Facts and Course of Proceedings

{¶ 5} In February 2013, MCCS received a referral regarding I.W., who was born in late January 2013. Although no toxicology screen was done on Mother or I.W., the child began showing physical signs of withdrawal shortly after birth. When questioned, Mother admitted taking prescription drugs not as prescribed. I.W. was placed in the Neonatal Intensive Care Unit ("NICU") for the withdrawal, and was sent home with the parents after three weeks.

{¶ 6} At the time, the parents were living in a homeless shelter with their two-year old son, A.W., Jr. The hospital gave them instructions to follow up with a primary care physician, but they failed to take I.W. to four scheduled appointments. On several occasions in March 2013, the parents returned to Dayton Children's Medical Center ("CMC") with I.W., but failed to follow up with a primary care physician as directed. Finally, on March 22, 2013, they returned to CMC with the child, where he was admitted with a diagnosis of Flu, RSV, Failure to Thrive, Oral Thrush, Pyelonephritis, Bacteremia, and a gastrointestinal condition.

{¶ 7} While I.W. was in the hospital, the parents and A.W., Jr., moved into the Ronald McDonald House, which was across the street from CMC. Mother was encouraged to room in with I.W., but she failed to do so until April 9, 2013. The parents also failed to follow instructions on how to feed I.W., and CMC would not release the child to them. As a result, MCCS filed a complaint with the juvenile court on April 11, 2013, and asked for interim temporary custody of I.W. at an ex parte hearing. The order was

granted the same day, and the court set further hearings.

{¶ 8} On April 11, 2013, MCCS also filed a neglect and dependency complaint concerning A.W., Jr., who had been born in November 2010, based on developmental concerns about the child. The parents claimed A.W., Jr., was autistic, but he had never been tested. However, A.W., Jr. had out-of-control behaviors, and the CMC staff observed that Mother could not control him. In addition, the family had previously been linked to the "Help Me Grow" program, but did not cooperate and had been discharged. The trial court granted MCCS interim protective supervision over A.W., Jr., and set the matter for further hearing. Counsel was appointed for each parent, and a guardian ad litem ("GAL"), Shireen Hebert, was appointed for the children.

{¶ 9} In July 2013, the GAL filed a report, recommending that temporary custody of I.W. continue and that Mother be ordered to call and schedule a full physical/well-child check for A.W., Jr. as soon as possible. The GAL noted concern over Mother's lack of follow-through with both children and with meeting her own mental health needs. The GAL also described I.W. as a fragile child. At the time of the GAL's visit, the parents were living in an apartment in which they had been placed by St. Vincent De Paul's Homefull program, which was to pay the first three month's rent.

{¶ 10} At an adjudicatory hearing held on July 9, 2013, the court found I.W. and A.W., Jr. neglected and dependent. Among other things, the court concluded that Mother had significant substance abuse issues that had not been addressed.

{¶ 11} In August 2013, the GAL filed a supplemental report in connection with a dispositional hearing scheduled for August 28, 2013. Among other things, the GAL noted that Mother had missed or cancelled 15 of 36 visits with I.W., had made inconsistent

statements about her own drug use and A.W., Jr.'s developmental services, and had refused to sign a consent form to have I.W. circumcised, which doctors recommended to minimize kidney infections.

{¶ 12} On September 5, 2013, the court filed an order extending MCCS's temporary custody over I.W., and protective supervision of A.W., Jr., until April 11, 2014. Subsequently, on October 21, 2013, MCCS filed a motion and affidavit for interim temporary custody of A.W., Jr. According to the affidavit, A.W., Jr. was three years old and could not speak. However, Mother and Father had failed to complete paperwork and take A.W., Jr. to be assessed at CMC's developmental clinic. Mother had also failed to comply with essential services that had been arranged for A.W., Jr. with the PACE program for Early Intervention Services, and with Help Me Grow. Mother had also inaccurately reported to MCCS that she had followed through on all services.

{¶ 13} Interim temporary custody of A.W., Jr. was granted to MCCS on October 25, 2013, and further hearings were scheduled. On December 12, 2013, the GAL filed a report, indicating that the parents had been evicted from their apartment for non-payment of rent and were now living at the home of Mother's grandmother. The GAL again noted inaccuracies and inconsistency in information the parents gave to providers and caseworkers. In addition, the GAL was concerned about Mother's mental health and/or pain pill addiction.

{¶ 14} After a hearing, the court filed an order on January 2, 2014, granting MCCS temporary custody of A.W., Jr. until October 21, 2014. In February 2014, MCCS filed for a first extension of custody for I.W., stating that the parents had not made significant progress on their case plan objectives. Among other things, Mother had not signed a

release for her mental health provider, the parents had not provided needed documentation of housing and employment, had not consistently visited the children, and had failed to engage with medical providers as required by the case plan. After a hearing, the court granted the first extension for I.W. on March 21, 2014.

{¶ 15} In July 2014, Mother gave birth to a third child, S.W., who was in the NICU for over a week due to drug withdrawal symptoms. On July 28, 2014, MCCS filed a dependency complaint and motion with the court, asking for interim temporary custody of S.W. According to the affidavit filed with the complaint, Mother was in treatment at Clearing Paths for mental health and drug dependency, and was taking Subutex for her addiction to Xanax. At the time Mother was admitted to the hospital, she had additionally tested positive for Benzodiazepine. The court issued the order the same day, and set further hearings. Hebert was also appointed the GAL for S.W.

{¶ 16} Subsequently, in late August 2014, MCCS filed motions for permanent custody of I.W., and A.W., Jr. The GAL filed a report in September 2014, highlighting issues with Mother's addiction and truthfulness on various subjects, including her reasons for cancelling visitation with S.W. At that time, the GAL did not make a permanent custody recommendation, but asked for additional time, since counsel had just been appointed for the parents. A hearing on the permanent custody motions was set for November 12, 2014.

{¶ 17} In November 2014, the GAL filed a supplemental report recommending extensions of the agency's temporary custody of I.W. and A.W., Jr., due to "strong concerns about Mother's truthfulness and her willingness and ability to be the primary care provider as Father works long hours during the day." *See, e.g.*, J.C. Case No. 2013-

2560, Doc. #72, p. 5.   The GAL also noted that Mother had a 12-year history of addiction to Xanax and other prescription drugs, and had only begun to engage herself in program requirements in the past few months.   *Id.*   In addition, the GAL was concerned about the children's safety while in Mother's care and about Father's unwillingness to appreciate the extent of risk to the young children if they were left in Mother's care during the day.

{¶ 18} MCCS did move for extensions of temporary custody of I.W. and A.W., Jr. and the court granted those on December 1, 2014.   In late March 2015, MCCS filed motions asking that the court grant legal custody of I.W., A.W., Jr., and S.W., to both parents, or in the alternative to Father.   The affidavit accompanying the motions indicated that the custody extensions were set to expire in late July 2015, and that the parents had made substantial progress on their case plan objectives.   Among other things, MCCS indicated that Mother had been transitioned out of the Suboxone program and was no longer taking Suboxone, that the parents were going to be working with Agape Reunification Services, that Father was employed, that parents had maintained their housing for a significant period of time, and that Father had attended most of the medical appointments for I.W., but could not attend all due to his work schedule.   Trial on the motions was set for June 23, 2015.

{¶ 19} However, shortly thereafter, on April 15, 2015, the GAL filed motions for permanent custody of I.W. and A.W., Jr., and for a first extension of temporary custody of S.W.   The motion was supported by the affidavit of the GAL, who stated that a return of custody to the parents would not be in the children's best interests.   In this vein, the GAL made many observations regarding the parents' failure to adequately attend and participate in I.W.'s needed medical appointments; their two-year delay in approving a

medical procedure for I.W., which increased his risk of infection and hospitalization; the parents' failure to attend any medical appointments for the other two children; the uncleanliness of the parents' home, even though Mother was not working; Mother's admission that she was not bonded with I.W. and A.W., Jr. and that she could not "handle it" when S.W. cried; Mother's admission that while she had been transitioned out of the Suboxone program, she had continued to take prescription medication that was not currently prescribed, including Klonopin and Zofran; the GAL's belief that Mother had not met the case plan objectives concerning mental health and drug abuse; Mother's history of untruthfulness, which would put her children at risk; Father's inability to protect the children because of his inability to discern the truth or parenting deficits of Mother; the fact that Father had a seizure disorder but continued to drive without addressing his medical needs, thereby placing the children at risk if they were returned; and issues about the parents' housing.

{¶ 20} On April 3, 2015, or shortly before the GAL's motion was filed, the MCCS caseworker met with Mother and brought S.W. for a home visit because they were working on a possible transitional plan. Mother mentioned that she had just seen her doctor at Clearing Paths and he had prescribed Celexa. Mother never mentioned rejoining a Suboxone program.

{¶ 21} After a hearing on April 7, 2015, the court ordered the parents to submit to a drug screen. Mother tested positive for buprenorphine, which is the medical term for Suboxone or Subutex. On May 29, 2015, the MCCS caseworker asked Mother about the drug screen. At that point, the caseworker had received the test results. Mother was adamant that her drug screen would be clean, and stated that if anything showed up,

it would be Klonopin, which had been prescribed. Mother denied numerous times that Suboxone would be present, and verified that she had been discharged from the Suboxone program in January 2015. However, when Mother was shown the positive drug screen, she admitted she had rejoined the Suboxone program. Mother then stated she had rejoined the program after the April court date and that the test result must have been wrong. This could not have been correct, however, because the drug screen would have taken place before Mother admitted to having rejoined the program.

{¶ 22} The caseworker then called Clearing Paths and put the agency on speakerphone. A caseworker from Agape was also on the line. At that time, MCCS discovered that Mother had been returned to the Suboxone program in March 2015. MCCS also learned that Mother had been discharged from the program for noncompliance earlier in May, i.e., prior to the May 29, 2015 discussion with the caseworker and the phone call to Clearing Paths.

{¶ 23} On June 11, 2015, MCCS filed amended motions for permanent custody of I.W. and A.W., Jr. MCCS also filed an amended motion for first extension of temporary custody of S.W. on June 15, 2015, and then filed a second amended motion and affidavit for permanent custody of S.W. on August 13, 2015. These motions were based on grounds similar to those raised by the GAL's motion.

{¶ 24} On June 17, 2015, the GAL filed a report, recommending that the court grant permanent custody of I.W. and A.W., Jr. to MCCS, and a first extension of temporary custody of S.W. to MCCS. The court set a hearing on the motions for September 16, 2015, and the GAL filed a supplemental report on September 10, 2015. At the time, A.W., Jr. had been diagnosed with adjustment disorder and was undergoing therapy

because of anxiety before and after visitation. A.W., Jr. expressed concern that his foster mother would leave him and he would not sleep alone after visitation. He also now wet the bed, after previously having been potty-trained. Likewise, I.W. had difficulty sleeping after visits.

{¶ 25} In addition, the GAL noted that the parents were not present for the specialist and pediatric appointments for I.W. in August. The GAL noted some positive interaction in a visit among mother and the children. However, Mother had been permanently discharged from the Suboxone program and was no longer engaged at Clearing Paths for services. Father was also out of the home working from 7:00 a.m. to 7:00 p.m. Despite the fact that Father was employed, the GAL concluded that Mother had made no progress and was essentially in the same place she had been two years ago. The GAL recommended that permanent custody of all the children be granted to MCCS.

{¶ 26} At the hearing on September 16, 2015, the court heard testimony from the following individuals: a CMC nurse; Mother's therapist at Clearing Paths; I.W.'s foster parents; and two reunification workers from Agape. The nurse testified about discussions he had with Mother on January 13, 2015, the day before I.W.'s scheduled surgery. Mother represented during the conversation that MCCS was watching I.W. for a little while because she was sick when she had the baby, and then the agency had to watch I.W. because Mother went to law school. None of this was true.

{¶ 27} The Clearing Paths therapist came in contact with Mother in 2013. She indicated that Mother began the Suboxone program in 2014 and was required to attend group counseling sessions twice a week and to meet with a therapist twice a month. In

early January 2015, Mother requested a detox from Suboxone, which was a step-down process.

{¶ 28} However, instead of complying with a tapering-down process, Mother took the Suboxone as normally prescribed. She went without Suboxone for several days and ended up going back to Clearing Paths to ask for help because she was sick. According to the medical records, mother complained of withdrawal symptoms on February 6, 2015. She then asked to be put back on Suboxone on March 13, 2015. Drug screens indicated that Mother tested positive for benzodiazepines in March 2015; for Suboxone in April 2015; and for Suboxone and some type of opiate in May 2015. (At the time, MCCS was under the impression that Mother was no longer taking drugs and had successfully completed drug treatment at Clearing Paths.)

{¶ 29} On May 21, 2015, Mother was dismissed from Clearing Paths because she failed to comply with requirements for meeting with her therapist and group meetings. Mother only met with her therapist three times in 2015, although she had attended more regularly in 2013 and 2014.

{¶ 30} The Agape employees testified that Agape is supposed to work with people on reunification for a minimum of five hours a week, up to a maximum of ten hours. Agape received a referral and started with the family on March 31, 2015. The program was supposed to last 12 weeks, but lasted 14 weeks. Mother averaged only 2.33 hours a week during the 14 weeks and did not complete the program. The reunification specialist only met with Father on two dates when they went to court, and he never contacted her to request services. Agape is also able to provide services on weekends, but the parents did not ask.

{¶ 31} The foster parents of I.W. had cared for him for about two and a half years. They described the extensive medical care that had been required for I.W., as he had kidney reflux, which caused urine to back up into the kidneys and cause infections. This resulted in many medical appointments and procedures, and trips to the emergency room. The foster parents indicated that Mother and Father had not been to any of the pediatric appointments. Mother and Father had been present for some procedures, like renal testing. In March 2015, knowing the agency was contemplating reunification, the foster father allowed Mother to take the lead role during one medical procedure. However, Mother was crying and said I.W.'s crying made her anxious. Mother then asked the foster father if he would take I.W. and calm him down.

{¶ 32} Mother and Father had visitation with I.W. for three hours on Tuesdays, from 4:00 p.m. to 7:00 p.m. Father was present for only part of this time period, due to his work schedule. When I.W. returned home after these visits, he was very hungry, restless, clingy, and cranky, and did not want to go to bed, which was not typical of his behavior on other days.

{¶ 33} The custody hearing was continued to November 20, 2015. On that date, the GAL filed another supplemental report, again recommending that the agency be granted permanent custody. The GAL indicated that Mother and Father had been asked to leave their prior home because it needed to be sold. Although the parents had been given four months free rent to save up money for the purchase, they had not been able to do so. Their rent at the prior home was $300 a month.

{¶ 34} The GAL was unable to view the new home, as Mother did not return the GAL's call and would not allow her in the home without Father present. On a prior visit,

Father had exploded and became aggressive and angry with the GAL when she was questioning Mother about her day-to-day activities. The GAL also noted that neither parent had attended medical appointments for I.W. and S.W. in September and October.

{¶ 35} Finally, the GAL noted that A.W., Jr. had two emergency removals from the foster parent's home due to uncontrollable behaviors. A.W., Jr. told his foster mother that he was going to live with his parents on November 20, 2015. When the foster mother picked A.W., Jr. up from the emergency removal on November 18, A.W., Jr. told her that "he knew if he was bad enough she would be called to pick him up and that he wants to stay with her and not go back to [Mother]." J.C. Case No. 2013-2560, Doc. #39, p. 3.

{¶ 36} At the hearing held on November 20, 2015, the court heard testimony from the following witnesses: the MCCS caseworker; Mother's aunt; Mother; and Father. The caseworker reviewed what had occurred in the case from the time that the referral was made in February 2013, based on I.W.'s withdrawal symptoms at birth. She indicated that when MCCS became involved with the family, the agency was concerned with the family's ability to meet the specific needs of their children, with a lack of housing, and with Mother's mental health and substance abuse. She stated the housing objective had not been met, because the parents had moved to a new home two months ago and the agency required at least a six-month period of stability. Because the family had been evicted previously when not housed by family members, MCCS was concerned that they would be unable to maintain their current housing. In addition, the rent was about double what they had previously paid.

{¶ 37} Father had been able to meet the income requirement, but Mother did not. Originally, visitation with the children was set for Tuesdays and Thursdays. However,

Mother asked for visitation to be reduced to Tuesdays only because she wanted to look for work. However, Mother never obtained employment.

{¶ 38} As to Mother's mental health and substance abuse problems, the caseworker relayed many of the facts outlined above, and indicated that nothing had changed. At the time reunification was being considered, MCCS was under the impression that Mother was compliant with mental health and drug treatment concerns. However, MCCS subsequently obtained the drug screens and learned that Mother had re-engaged in services while failing to disclose the fact. In addition, Father had not informed the caseworker, either. Father either knew and did not think it was important, which was a concern, or he did not know, and that would also be a concern because Father did not know what his wife was doing while he was at work.

{¶ 39} MCCS also was concerned about the parents' ability to care for the children's medical and developmental issues. The parents had attended only 9 of 33 medical appointments during the case, and had never attended pediatrician appointments, which were important for continuity of care. The parents also did not have a clear idea of the medical issues of their children. Consequently, this part of the case plan had not been completed. Further, the parents did not follow through with Agape reunification services and with Celebrating Families, which would have allowed MCCS to set up a transitional plan.

{¶ 40} All three children were very bonded with their caregivers, and were in foster-to-adopt homes. All foster families were willing to adopt the children. The caseworker stated that it was in the children's best interests to be in permanent custody of the agency because nothing had changed regarding Mother's mental health and substance abuse

issues. She indicated MCCS could not safely return the children to the home even with protective supervision and could not ensure the children's needs were being meet. Mother would not allow the GAL into her home unless Father was there, and with the severity of the children's needs and the numerous appointments, it would not be possible to verify all that and ensure the children were safe. In addition, Father did not provide direct care for the children and was not there to monitor mother. To the contrary, Father continued to enable and support Mother.

{¶ 41} Mother's aunt testified that she lived in the area and thought Mother was more responsible than she used to be. She stated that Mother did not rely on medicine like she used to. She commented that Mother used to not be responsible about paying bills – implying that Mother was now financially responsible. The aunt indicated she was retired and was not able to take custody of the children.

{¶ 42} Mother testified that she had completed her case plan. She denied missing the majority of medical appointments. She admitted missing all the pediatric appointments, claiming that she did not get notice and that her caseworker was hard to reach. Mother stated that she had not looked for employment for two years. She said it was hard to find a job that would pay enough for her to have money left after paying child support for two other children.[2] Additionally, Mother stated that she did not wish to

---

[2] Mother had been ordered to pay child support for two children of a prior marriage who were not in her custody. The child support was $100 per month for two children, as of October 1, 2010, plus an additional $87.76 that was ordered on October 2, 2014, based on arrearages that began on December 1, 2008. *See* GAL Ex. 6, p. 1. As of August 31, 2014, the child support arrearage was more than $20,000, and no payments had ever been processed, meaning that in almost six years, Mother never made any payments on her child support obligation. At the time of the November 20, 2015 custody hearing, a bench warrant had been issued for Mother, based on her failure to pay support. She had also previously been sentenced to spend weekends in jail in 2015. In addition,

seek employment, but wanted to stay at home and parent her children.

{¶ 43} Mother admitted she had a substance abuse problem, but claimed the only medications her doctor currently prescribed were Celexa and Atenolol. She acknowledged she did not attend the programs at Clearing Path regularly at all, but claimed she had received a lot of help.

{¶ 44} Father stated that Mother did not currently have a substance abuse problem, and said she had shown great improvement. Father admitted to non-completion of the Agape program, but asserted that he and Mother had not been given a chance. He also stated that he did not want his children placed in daycare while he worked because daycares cannot be trusted.

{¶ 45} At the conclusion of the hearing, the GAL again recommended that the court award permanent custody to MCCS. On January 28, 2016, the magistrate filed a decision granting MCCS's motion for permanent custody of all three children. The magistrate found that the parents had not completed their case plans and that reunification was not possible within a reasonable time because the parents had not demonstrated the ability to parent the children and refused to acknowledge Mother's substance abuse issues. In addition, the magistrate found, with respect to each child, factors indicating that permanent custody to the agency was in the child's best interest.

{¶ 46} In February 2016, both parents filed objections to the magistrate's decision and then supplemented their objections after the transcript was filed. In May 2017, the trial court overruled both parents' objections and supplemental objections to the

_____

Mother admitted lying to the GAL on April 3, 2015, about the visitation she had with these two other children. Mother also admitted at trial that her visitation with those children was currently suspended.

magistrate's decision, and awarded permanent custody of the children to MCCS. Mother and Father timely appealed from the court's decision.

## II. Placement With Parents Within a Reasonable Time

{¶ 47} Because Mother and Father's First Assignments of Error are similar, we will consider them together. Mother's First Assignment of Error states that:

The Trial Court Erred and Abused Its Discretion in Finding that the Children Could Not Be Placed With the Mother or Father Within a Reasonable Time as Same Was Against the Manifest Weight of the Evidence.

{¶ 48} Father's First Assignment of Error states as follows:

The Trial Court Erred in Granting MCCS Permanent Custody of These Children Because the Child Could Be Placed With Father Within [a] Reasonable Time.

{¶ 49} Under this assignment of error, Mother contends that the trial court erred in concluding that the children could not be placed with her within a reasonable time because MCCS acknowledged in March 2015 that Mother had followed through with all recommendations for mental health and substance abuse treatment. In addition, Mother contends that MCCS "dropped the ball" in notifying the parents about medical appointments, and that she was actively engaged in working with Agape on reunification until MCCS changed its position on reunification due to Mother's positive drug screen.

{¶ 50} Father contends that he made substantial progress and that the agency's only concern was that he worked full-time and would not know what Mother was doing

during the daytime. According to Father, there was no evidence that he could not use daycare; he also asserts that he was not blindly supporting Mother.

**{¶ 51}** "In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence." *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing R.C. 2151.414(E). (Other citation omitted.) "The court's decision to terminate parental rights, however, will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. We review the court's judgment on this matter for abuse of discretion. *In re E.D.* at ¶ 7, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (applying abuse-of-discretion standard to trial court's findings under R.C. 2151.414).

**{¶ 52}** Before discussing the parents' claims, we must first note that these particular assignments of error apply only to S.W. As relevant here, R.C. 2151.414(B)(1) states that:

> Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> (a) The child is not abandoned or orphaned, has not been in the

temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

* * *

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the

Revised Code or the date that is sixty days after the removal of the child from home.

{¶ 53} There is no dispute in this case that I.W. and A.W., Jr., had been in the temporary custody of MCCS for twelve or more months of a consecutive twenty-two month period, and that MCCS only needed to establish that an award of permanent custody to the agency was in the best interests of these children. *See, e.g., In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176 at ¶ 21; *In re E.S.*, 2d Dist. Clark No. 2016-CA-36, 2017-Ohio-219, ¶ 20.

{¶ 54} Furthermore, no dispute exists concerning the fact that S.W. did not meet the 12-of-22 consecutive months requirement in R.C. 2151.414(B)(1)(d), and that MCCS was, therefore, required to prove one of the other grounds in R.C. 2151.414(B)(1). The applicable ground is found in R.C. 2151.414(B)(1)(a), which requires that "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." For purposes of this decision, R.C. 2151.414(E) requires trial courts to find, by clear and convincing evidence, that one or more of the items listed in R.C. 2151.414(E)(1)-(16) apply.

{¶ 55} In reaching its decision to award permanent custody to MCCS, the trial court relied on R.C. 2151.414(E)(1) and (4). A court only needs to find one factor to support its holding. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 50, citing R.C. 2151.414(E) and *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

{¶ 56} After discussing the record and testimony in detail, the trial court concluded that "both Mother and Father had failed continuously and repeatedly to substantially

remedy the conditions causing the child to be placed outside the child's home." *See, e.g.*, J.C. Case No. 2013-2559, Doc. #7, p. 15. Before stating this conclusion, the court commented that:

> Mother does not agree that she has failed to complete her case plan. (Tr. 315:20) Mother is of the opinion that she has completed her case plan objectives two times over. (Tr. 322:5) Mother testified that Ms. Back [the caseworker] previously told her, with Father present, that she was very proud of her, that they had completed the case plan, and that the children could come home. (Tr. 315:24) Yet, Mother acknowledges that not telling Ms. Back about her re-engagement into the Suboxone program was wrong, and Mother notes that everything changed after this omission. (Tr. 316:3). Ms. Back notes that MCCS originally filed for legal custody of * * * all three children to parents. (Tr. 202:20) However, Ms. Back testified that MCCS's position changed after Mother's positive drug test and her resulting falsities thereafter. (Tr. 202:23) Because there have been ongoing concerns from all parties involved concerning Mother's ability to care for the children, Ms. Back testified that MCCS tried to think outside the box and was considering giving legal custody to Father, with the children in daycare while Father worked. (Tr. 203:1) Unfortunately, Mother and Father were not in favor of the children going to daycare while Father worked during the day, and Father had no concerns with Mother's ability to parent and care for the children. (Tr. 203:8) Additionally, at the time the motion for legal custody was filed, MCCS believed Mother was sober as well as compliant

with her mental health treatment provider.

J.C. Case No. 2013-2559, Doc. #7, at p. 15

**{¶ 57}** The record contains substantial evidence supporting the trial court's conclusions. I.W. was initially placed outside the home due to Mother's substance abuse problems and the parents' inability to properly care for his physical well-being. There was no evidence that Mother and Father had addressed these problems, despite assistance by the agency. To the contrary, Mother continued to improperly use drugs and never completed her mental health or substance abuse treatment.

**{¶ 58}** Mother also made untruthful statements throughout the case. For example, In 2014, Mother claimed she had not accomplished her case plan items because she was on bedrest for S.W.'s pregnancy. When MCCS asked for a letter, Mother provided a letter from her prenatal provider, and then altered the letter by adding a statement at the bottom that "Xanax addiction no longer a concern," with the initials "MD" next to the statement. *See* State's Ex. 7. When the caseworker contacted the prenatal provider, she learned that no such note had been placed on the letter, and Mother later admitted altering it. Mother was also untruthful about her drug treatment, and as the trial court noted, attempted to provide a urine sample to the doctor that was not her own. *See* J.C. Case No. 2013-2559, Doc. #7, at p. 12. Even at trial, Mother claimed urinalysis tests that showed she was abusing drugs were not correct.

**{¶ 59}** As to Father, it is true that he obtained a job and provided income. However, MCCS was rightfully concerned about the safety of the children. Both parents did not want the children to attend daycare, and, given the evidence, the children would not be adequately protected while in Mother's care, particularly when Father refused, in

the face of overwhelming evidence, to believe that Mother had problems that would prevent her from adequately caring for the children.

{¶ 60} As was noted, the trial court also found under R.C. 2151.414(E)(4) that the parents had "demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child * * *."

{¶ 61} Again, the record contains more than adequate evidence to support this finding.   Over the significant period of time that the case was pending, the only actions Mother took were to visit the children once a week for a few hours.   She even decreased her visitation by claiming that she wished to seek employment.   To the contrary, however, Mother stated at trial that she had not attempted to find employment for the past two years.   Mother and Father also failed to attend any pediatric appointments for the children, meaning that they had very little insight into their children's medical situations. Mother and Father claimed they were not properly notified, but the caseworker indicated they were notified, and this was a credibility issue.

{¶ 62} We have often stressed that "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact."   *In re A.J.S.*, 2d Dist. Miami No. 2007-CA-2, 2007-Ohio-3433, ¶ 22.   The " 'rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "   *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).   Finally, Mother and Father provided no proof that they had actually

attempted to contact MCCS about these issues.

**{¶ 63}** The trial court also focused on the fact that the parents' lack of progress with case plan objectives revealed an unwillingness to provide basic necessities like "a safe, stable home." J.C. Case No. 2013-2559, Doc. #7, at p. 16. For the reasons previously mentioned, we agree with the trial court.

**{¶ 64}** As a final matter, the parents did not demonstrate commitment even when MCCS was attempting to reconcile the family. Father complains that the family was not given a chance to complete Agape's reunification plan, but the facts indicate otherwise. The usual time frame for the program is 12 weeks. Over a 14-week period, Mother only worked with the agency 2.33 hours per week rather than the minimum of five hours, and Father never attempted to contact Agape.

**{¶ 65}** In light of the preceding discussion, we conclude that the trial court did not err in finding that the children could not be placed with either parent within a reasonable time or should not be placed with the child's parents. R.C. 2151.414(B)(1)(a) and (2). Accordingly, Mother and Father's First Assignments of Error are overruled.

III. The Best Interests of the Children

**{¶ 66}** Again, Mother and Father have presented similar assignments of error. Mother's Second Assignment of Error states as follows:

> The Trial Court Erred and Abused Its Discretion By Finding That Permanent Custody to the Montgomery County Department of Job and Family Services Was in the Best Interest of the Children as Said Finding Is Against the Manifest Weight of the Evidence.

{¶ 67} Similarly, Father's Second Assignment of Error states that:

The Trial Court Erred in Granting MCCS Permanent Custody of These Children Because It Was Not in the Best Interest of the Children.

{¶ 68} Under this assignment of error, Mother contends that the trial court erred in finding that permanent custody was in the children's best interest. Mother contends that she had loving and warm interactions with her children, that the parents had safe and stable housing, that Father had sufficient income, and that the trial court's decision was not sufficiently detailed to determine if the court had properly considered the statutory factors.

{¶ 69} Father contends that the decision is inconsistent with MCCS's earlier decision to attempt to return the children to their parents. Father also contends that he is capable of caring for the children, and that he had substantially completed his case objectives.

{¶ 70} Regarding a child's best interests, "R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are

applicable." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15. "No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816 at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. To evaluate the court's decision, we will consider these factors.

A.   Interaction and Interrelationship of Children with Parents and Foster Parents

{¶ 71} The trial court noted that all three children were doing very well in their foster care placements and were very bonded with their caregivers. Furthermore, the foster parents had indicated willingness to adopt the children, who had all been in the same foster care placements for either all or the majority of their young lives.

{¶ 72} The court also observed that I.W. was often reluctant to go to Mother, and that he was adversely affected after visiting with the parents. In addition, the court recounted examples where I.W. rejected Mother in favor of his foster parent during medical examinations, and noted that the parents failed to testify that any of the children were bonded to them. These observations are supported by the record.

{¶ 73} We previously noted A.W., Jr.'s behavioral difficulties after being told he was going to live with his parents. Although Father and Mother visited regularly, Father missed a substantial part of the weekly visit because he was working. And finally, Mother told the GAL that she was not bonded with I.W. and A.W., Jr. and that she could not "handle it" when S.W. cried. As a result, the record contains clear and convincing evidence that the children do not have a strong emotional bond to the parents and do have a bond and positive relationship with their foster parents.

### B. The Wishes of the Children

{¶ 74} The court concluded that the children were too young to express their wishes, and did not weigh this factor in favor of either side. We agree. Moreover, A.W., Jr. was the eldest child (about five years old at the time of the permanent hearings), and had been in his parents' custody the longest before removal. To the extent A.W., Jr.'s behavior exemplifies his wishes, he clearly did not wish to live with his parents.

### C. Custodial History

{¶ 75} In connection with this factor, the trial court recounted the custodial history of the children, as noted above. This concerned the length of time the children had been in the custody of the agency, including the fact that I.W. and S.W. had been in custody almost since birth, due to Mother's substance abuse problems and the lack of parental completion of case plans. A.W., Jr. had been left in the parents' custody for a period of time in the hope that the parents could meet his developmental needs, but that did not occur. In view of our prior discussion, we agree with the court that the custodial history favors MCCS.

### D. The Need for Legally Secure Placement

{¶ 76} Regarding this factor, the court detailed the history of the case, and concluded that the children were in "desperate need of a legally secure, permanent placement." J.C. Case No. 2013-2559, Doc. #7, at p. 19. The court noted that the parents had not completed their case plan, and that reunification was impossible because

of this fact and because continuing issues existed due to Mother's substance abuse issues, mental health problems, and inability to care for the children. Additionally, the court noted the GAL's concern over Father's continued position that an appropriate level of care was provided to the children by the parents before MCCS involvement and during the case. The court further stressed the GAL's concern over significant developmental and medical needs of the children, the lack of relatives willing or able to accept custody, and the fact that the children were in foster-to-adopt placements. The court, therefore, concluded that this factor weighed in favor of MCCS. Again, based on our prior discussion, we agree with the trial court. In view of the record in this case, there was no reasonable possibility that the parents would be able to provide a legally secure and safe environment for the children.

{¶ 77} Accordingly, based on the preceding discussion, we conclude that the juvenile court properly weighed the pertinent factors in R.C. 2151.414(D), and in doing so, did not abuse its discretion in finding that granting permanent custody to MCCS was in the children's best interest. Mother's and Father's Second Assignments of Error, therefore, are overruled.

IV. Reasonable Efforts

{¶ 78} Father's Third Assignment of Error states that:

The Court Erred in Granting Permanent Custody Because There Were Reasonable Efforts That Could Have Prevented Removal, and the Same Would Not Be Futile.

{¶ 79} Under this assignment of error, Father contends that MCCS failed to meet

its burden to prove that it made reasonable efforts to prevent removal or to prevent continued removal. According to Father, it would have been reasonable for the agency to arrange childcare while Father worked and to require Father to limit Mother's visitation.

**{¶ 80}** " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. " 'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." (Citation omitted.) *In re K.M.*, 12th Dist. Butler No. CA 2004-02–052, 2004-Ohio-4152, ¶ 23. *Accord In re C.O.*, 2d Dist. Montgomery No. 26610, 2015-Ohio-4290, ¶ 43; *In re N.M.*, 2d Dist. Montgomery Nos. 26693, 26719, 2016-Ohio-318, ¶ 53.

**{¶ 81}** We have also defined "reasonable efforts" as " 'a good faith effort which is "an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage." The issue is not whether [the Agency] could have done more, but whether it did enough to satisfy the "reasonableness" standard under the statute.' " *In re S.F.*, 2d Dist. Montgomery No. 25318, 2013-Ohio-508, ¶ 21, quoting *In re Secrest*, 2d Dist. Montgomery No. 19377, 2002-Ohio-7096, ¶ 13.

**{¶ 82}** The trial court concluded that MCCS had made reasonable efforts to reunify the children and parents and to eliminate the children's continued removal. The trial court mentioned all the services provided, including referrals for employment, notification of appointments, visitation, referral to Agape and Celebrating Families, and parenting

classes. The court noted that while a case plan had been developed, neither parent competed the plan, and Mother made minimal effort. We agree with the trial court.

{¶ 83} Furthermore, concerning Father's challenge with respect to daycare, both parents clearly indicated they did not want daycare and wanted Mother to take care of the children. Father worked long hours and it was simply not possible to implement such a plan in view of Mother's problems and Father's unwillingness to accept the existence and severity of the issues.

{¶ 84} Father also contends that he did not terminate Agape, and took no action that changed MCCS's position on reunification. We disagree. Father made no attempt whatsoever to contact Agape, nor did he meaningfully participate in the case other than to obtain employment and engage in limited visitation. His refusal to accept and deal with Mother's problems was also a barrier to reunification. MCCS worked with the parents for more than two years before filing for permanent custody, and was not required to do more than what it did.

{¶ 85} Based on the preceding discussion, Father's Third Assignment of Error is overruled.


V. Conclusion

{¶ 86} All of Mother's and Father's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Alice B. Peters
Jennifer S. Getty
Nicole Rutter-Hirth
Shireen Hebert
Hon. Anthony Capizzi