[Cite as *In re N.M.*, 2016-Ohio-318.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: N.M.

:
:
:     Appellate Case Nos. 26693 and 26719
:
:     Trial Court Case No. 2012-0682
:
:     (Appeal from Juvenile Court)
:
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of January, 2016.

. . . . . . . . . . .

ANN M. GRABER, Atty. Reg. No. 0091731, 301 West Third Street, Fifth Floor, Dayton, Ohio 45422
       Attorney for Appellee-Montgomery County Children Services

MARCY A. VONDERWELL, Atty. Reg. No. 0078311, 120 West Second Street, Suite 333, Dayton, Ohio 45402
       Attorney for Appellant-T.C.

KATE L. BOWLING, Atty. Reg. No.0084442, 2521 Far Hills Avenue, Dayton, Ohio 45419
       Attorney for Appellant-E.M.

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, the biological mother, T.C. ("Mother"), and the biological father, E.M. ("Father"), appeal from a judgment terminating their parental rights with respect to their daughter, N.M. In support of the appeal, both parents contend that the trial court erred in finding that clear and convincing evidence supported the grant of permanent custody or that custody was in the best interests of the child. Both parents also contend that the judgment is against the manifest weight of the evidence. Finally, Mother contends that the trial court erred when it found that Appellee, Montgomery County Children Services (MCCS), made reasonable efforts to reunify the family.

{¶ 2} We conclude that the judgment of the trial court was supported by clear and convincing evidence and was not against the manifest weight of the evidence. MCCS also made reasonable efforts to unify the family. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} On January 27, 2012, MCCS filed a dependency complaint alleging that N.M. lacked adequate parental care due to the mental or physical condition of her parents. According to the complaint, Mother had been found incompetent by the Department of Developmental Services (DDS), and had previously had a guardian appointed. Mother was also combative at the hospital where N.M. was born, and reportedly functioned at the level of a five- to eight-year old child. In addition, there was a history of domestic violence between Mother and Father.

{¶ 4} After MCCS was granted interim ex parte custody, the child was taken from

the hospital where she was born and was placed with a foster family. About a month after N.M.'s birth, Mother and Father filed motions asking the court to place the child with a maternal cousin, O.C. On March 8, 2012, the court granted O.C. legal custody, and the child was placed with O.C., where Mother also lived. MCCS was given protective supervision.

{¶ 5} Less than a month later, MCCS filed a motion and affidavit asking the court to once again return temporary custody to MCCS. In the motion, MCCS stated that Mother had called the police because O.C. and her boyfriend, who had an extensive criminal record of domestic violence, felonious assault, and cocaine possession, were fighting. O.C. had not disclosed this information to MCCS, nor had O.C. disclosed that since O.C. and Mother began living in the home in 2011, numerous calls had been made to the police regarding loud music, disorderly conduct, and boyfriend/girlfriend disputes. In addition, Mother had been allowing Father to stay overnight at the premises, even though O.C. was not supposed to allow this due to prior domestic violence between Mother and Father. There were also concerns about drug use in the home.

{¶ 6} After a hearing, the court granted MCCS temporary custody on April 12, 2012, and the agency placed N.M. with the same foster family that had cared for N.M. since birth. According to an amended case plan filed on April 16, 2012, Mother lacked basic cognitive skills and functioning to care for the child or for herself. Mother had admitted to smoking marijuana during her pregnancy and N.M.'s meconium had tested positive for cocaine at birth. On April 6, 2012, O.C. had tested positive for marijuana and benzodiazepines, for which she did not have a prescription. O.C.'s boyfriend had a criminal history involving substance abuse, and Father also had a history of substance

abuse.

**{¶ 7}** Under the case plan, Mother, Father, and O.C. were to complete parenting/psychological assessments, and follow all recommendations. They also needed to obtain stable housing with supplies for N.M., and were to visit with N.M. on a regular basis.

**{¶ 8}** In July 2012, a semi-annual administrative review was filed. At the time, Mother was living with Father and the paternal grandmother at the grandmother's home. Mother had completed a parenting class, but was deemed unsuccessful due to her inability to grasp the concepts and correctly identify the baby's needs during observation. The report indicated that Mother did her best, but was extremely limited due to her mental abilities. Mother did not understand that she could not parent her child adequately, nor did she recognize her limitations. In addition, MCCS stated that there were no services available that could be offered to remedy the problem.

**{¶ 9}** The report further indicated that O.C. had originally agreed to services, but asked to be taken off the case plan. O.C. also stated that she was not interested in having the child return to her home. When the child had been returned to foster care from O.C.'s home, the child had ringworm, thrush, a yeast infection, and rock-hard stools from having had mashed potatoes put in her formula. Finally, the report indicated that Father was in anger management and substance abuse counseling, but insufficient progress had been made.

**{¶ 10}** In December 2012, MCCS filed a motion and affidavit for permanent custody, noting the same concerns previously raised. Mother regularly visited N.M. (for four hours a week), but had supervised visits due to her inability to safely meet N.M.'s

needs.  Mother had been evaluated at Southwest Ohio Developmental Center (SOCD) in May 2011, was found to have an IQ of 55, and was diagnosed as having mild mental retardation.  At the time of the assessment, SOCD did not feel Mother had the skills or temperament necessary to safely raise a child without persistent outside supports.

{¶ 11} The motion and affidavit also noted that Father visited N.M. sporadically, and on visits when the parents were together, they argued and Mother became very emotional and moody.  Mother was splitting her time between the houses of Father and O.C..  Mother and Father had a history of domestic violence, and these issues had not been addressed, although Mother and Father were planning to get married.  Father had been fired from his last job and had no income source.

{¶ 12} In March 2013, Mother and Father both filed motions for extension of temporary custody, and the Guardian Ad Litem (GAL) that had been appointed for the child recommended that the court grant an extension to give Mother an opportunity to have a more current psychological evaluation and to give Mother time to obtain independent housing.

{¶ 13} In May 2013, the court granted a first extension of temporary custody, and ordered MCCS to make a referral for one-on-one parenting instruction for Mother.  On June 13, 2013, MCCS filed another motion and affidavit for permanent custody, containing the same kinds of allegations that had previously been made.  MCCS also noted that Mother was currently working with Allene Anderson of Celebrating Families Parenting Program, but that Anderson did not feel Mother was capable of parenting the child on her own.  Anderson also had serious concerns about the safety of Mother and N.M. so long as Father was in the home.  Mother had been referred for anger

management treatment, but was terminated because she did not feel she needed the program.

{¶ 14} At the time, Mother was living in the home of Father and the paternal grandmother. There were major safety concerns due to domestic violence between Mother and Father, and reported alcohol and marijuana abuse. Since August 2012, over twenty police calls were made to the home due to drinking by all three. On May 19, 2013, Father was charged with domestic violence for hitting Mother, and was also charged with public intoxication on June 6, 2013.

{¶ 15} In August 2013, the court set the matter for a two-day hearing in late October 2013. On October 7, 2013, the GAL filed a request for a second extension of temporary custody. In October 2013, the court also granted the request of both parents to have independent psychological evaluations. In a report filed on October 21, 2013, the GAL noted that Mother had moved into her own apartment in September 2013, and recommended a second extension of temporary custody to determine if domestic violence issues had been resolved by mother moving out of father's residence or by other means.

{¶ 16} On October 31, 2013, the trial court granted the motion for a second extension of temporary custody. The court concluded that the parenting time of Mother and Father needed to be separated so that each party's ability to independently parent the child could be assessed. Previously, the parties had visited the child for two hours on Monday and Wednesday; thereafter, each parent visited the child for one hour on each of those days.

{¶ 17} In December 2013, MCCS filed another affidavit and motion for permanent custody. These documents alleged that Mother and Father had not made significant

progress on case objectives. According to MCCS, Father was at Mother's house during November 2013, and an argument broke out. Mother blackened Father's eye and scratched him, and Father took her apartment keys, cell phone, and piggy bank so that Mother could not call the police. Mother was unable to read and could not handle her own affairs or independent care. In addition to the 2011 evaluation, Dr. Lilley had evaluated the parents and had found that N.M. could not be safely placed with the parents, due to their substance abuse, domestic violence, mental health, and developmental delays.

{¶ 18} In January 2014, the court set the matter for a two-day trial on April 7 and 8, 2014. Subsequently, the mother filed a motion asking for legal custody to be granted to her, with protective supervision to MCCS. Mother also asked that custody be granted to some maternal relatives, but that part of the motion was later withdrawn. In early April 2014, the GAL filed a report, noting that she had observed the child for a total of about five visits over a two-year period. The GAL noted that the supervised visits went well, and that both parents acted appropriately. Further, the GAL noted that Mother's apartment was clean and adequate for the child. The GAL recommended that Mother be granted custody, with protective supervision by MCCS.

{¶ 19} The trial court held hearings on April 7 and 8, 2014, and heard testimony from the following individuals: Allene Anderson; Myra Wheeler, the MCCS caseworker; a visitation supervisor; N.M.'s foster mother; and Vicki Harris and Cassandra Heard, employees of Healing Touch Agency, which was an agency providing assistance to Mother. The hearing was then continued until June 6, 2014. On June 6, 2014, the GAL filed an updated report, again recommending legal custody be granted to Mother, with

protective supervision by MCCS. On June 6, 2014, the magistrate heard testimony from Dr. Lilley, a clinical psychologist who had evaluated both Mother and Father, and from Daryle Tibbs, the GAL.

{¶ 20} After hearing the evidence, the magistrate filed a decision on August 18, 2014, concluding that permanent custody should be granted to MCCS. Both parents filed objections to the magistrate's decision, and on May 7, 2015, the trial court filed a decision sustaining the objections in part and overruling them in part. The trial court found that the child had been improperly designated during part of the case as "N.C." rather that N.M., but this was not a substantive decision. The trial court found in favor of MCCS on all substantive issues and granted permanent custody to the agency, terminating the parental rights of Mother and Father. This appeal followed.

II. Whether Clear and Convincing Evidence Supports the Decision

{¶ 21} Mother's First and Second Assignments of Error state that:

The Trial Court Erred in Finding that Clear and Convincing Evidence Supported the Granting of Permanent Custody.

The Trial Court's Granting of Permanent Custody Is Against the Manifest Weight of the Evidence.

{¶ 22} Similarly, Father's sole Assignment of Error states that:

The Trial Court Erred in Granting Permanent Custody to Montgomery County Children's Services Because that Agency Failed to Prove by Clear and Convincing Evidence that Permanent Custody Was in the Best Interest of the Minor Child and Such a Finding Was Against the Manifest Weight of

the Evidence.

**{¶ 23}** The parties argue first that MCCS failed to prove by clear and convincing evidence that permanent custody was in the child's best interests, because Mother had completed all case plan objectives, and had established a support network that would assist her with parenting.   In addition, Father argues that the trial court may not base its decision solely on a parent's limited cognitive abilities.

### A.   General Standards and the Issue of Clear and Convincing Evidence

**{¶ 24}** Parents have a fundamental right "to make decisions concerning the care, custody, and control of their children."   *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).   "In a proceeding for the termination of parental rights, all of the court's findings must be supported by clear and convincing evidence."   *In re M.S.*, 2d Dist. Clark No. 2008-CA-70, 2009-Ohio-3123, ¶ 15, citing R.C. 2151.414(E) and *In re J.R.*, 2d Dist. Montgomery No. 21749, 2007-Ohio-186, ¶ 9.

**{¶ 25}** "Clear and convincing evidence is that measure or degree of proof which * * * will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."   *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.   "Additionally, issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. In this regard, '[t]he underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "   *In re A.J.S.*, 2d Dist. Miami No. 2007-CA-2,

2007-Ohio-3433, ¶ 22, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 26} "R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." (Citation omitted.) *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14.

{¶ 27} In the case before us, the trial court concluded that N.M. had been in the custody of MCCS for over 12 months of a consecutive 22-month period, thereby satisfying R.C. 2151.414(B)(1)(d). There is clear and convincing evidence to support this conclusion, and it is also not disputed by the parties. As a result we need only consider whether the evidence supports the trial court's finding about N.M.'s best interests. *See, e.g., In re K.S.*, 2d Dist. Montgomery No. 26701, 2015-Ohio-4117, ¶ 8.

{¶ 28} "R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the

custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.* at ¶ 15.

**{¶ 29}** The Supreme Court of Ohio has held that "[w[hen determining the best interest of a child under R.C. 2151.414(D) at a permanent-custody hearing, a trial court may not base its decision solely on the limited cognitive abilities of the parents." *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, syllabus. According to Father, the trial court improperly based its decision solely on Mother's limited cognitive abilities.

**{¶ 30}** We have distinguished *In re D.A.*, however, where there is " 'objective evidence' to show that the statute was satisfied." *In re M.S.*, 2d Dist. Clark No. 2008-CA-70, 2009-Ohio-3123, at ¶ 44, quoting *In re D.A.* at ¶ 96. In the case before us, there is objective evidence demonstrating that the statute was satisfied.

**{¶ 31}** Similar to the mother in *M.S.*, Mother's cognitive limitations are "central to her parenting limitations and her inability to remedy the problems identified by" MCCS. *Id.* at ¶ 43. However, also like the mother in M.S., Mother "demonstrated an inability or unwillingness to address the problems." *Id.* at ¶ 44.

**{¶ 32}** For example, when confronted with the domestic violence issues in her family, Mother stated that she and the child's father had a lot of disagreements but would then get upset and refused to talk any longer about the issue. This was typical of

Mother's reaction to things she did not want to hear; she just closed down and did not want to be instructed. At the end of ten parenting sessions (which was the minimum amount) of a second parenting class, the instructor asked Mother if she wanted to continue working with the instructor, and Mother refused.

{¶ 33} Myra Wheeler, the MCCS caseworker, also testified that Mother exhibited anger issues despite having completed anger management classes. At times when Mother met with Wheeler, Mother would shut down and would not speak when she was asked questions or when Wheeler tried to discuss something Mother did not want to talk about. Mother had even physically trembled because she was angry, and had Wheeler leave her apartment because she did not want to talk anymore. In addition, Wheeler had seen Mother act inappropriately by being harsh and threatening when N.M. acted out in a manner that was typical for a two-year-old child.

{¶ 34} In February 2013, when Wheeler conducted a home visit with Father, he had an obvious black eye and swelling on the side of his face. Father stated that Mother had "one of her episodes" and had accused him of cheating on her with other women. Transcript of Proceedings, Vol. I, p. 63. Although Mother completed a domestic violence class in November 2013, and Father was taking domestic violence classes, another domestic violence incident occurred between them. In November or December 2013, the parties argued at Mother's apartment, and Mother called the police. According to Mother, Father had been drinking and came to her apartment. He would not leave when she asked him to leave. When she tried to push Father, he tried to choke her, and she called the police. Although Mother responded appropriately by calling the police, and by attempting to obtain a protection order, Mother told the judge that she was only getting a

protection order because of her landlord, not because she was afraid of Father, and the case was dismissed.

{¶ 35} Dr. Lilley, the psychologist who evaluated Mother and Father, stated that Mother denied domestic abuse incidents that were well-documented and that Father had verbalized to the doctor. Dr. Lilley indicated that Mother minimized the contentious relationship with Father and did not seem to realize that it could be damaging to a child. Dr. Lilley also testified to having observed Mother interact very passively with N.M. during visitation. Dr. Lilley further said that she could not support reunification because of concerns about Mother's parenting ability. This was based not only on Mother's cognitive limitations, but also on her minimization of the domestic violence, her inability to adapt parenting to the child's changing needs, her defensiveness, her unwillingness to recognize her own deficits, and her resistance to suggestions from others.

{¶ 36} There was also evidence that Mother and Father misrepresented their relationship to MCCS. While the caseworker was told that Mother and Father were no longer a couple, Mother told N.M.'s foster mother in January 2014 that their lawyers told them to say they had split up because it would better their chances. Additional verification came from Mother's home health aide, Angela Heard, who was assigned to Mother for five hours per day on weekdays and three hours on Saturdays. At the April 2014 hearing, Heard testified that Mother told her that she loved Father, that they had dated for six or seven years, and were still dating. Mother also said that she loved Father and was going to marry him. In addition, Heard took Mother to the hospital when Father was hospitalized, and Mother would stay all night with him at the hospital. According to Heard, the last time this had occurred was a week or two before the April 2014 hearing.

**{¶ 37}** Accordingly, the cognitive limitations were not the only reason for the trial court's decision. In fact, the court referred to Mother's inappropriate actions with the child, Mother's passivity, the concern about the domestic violence issues, and Mother's minimization of the violence problem. *See* Decision and Judgment Concerning Objections to the Decision of the Magistrate, Doc. #5, pp. 7, 8, and 10-11.

**{¶ 38}** When evaluating the best interests of N.M, the trial court considered the factors in R.C. 2151.414(D) and concluded that they weighed in favor of granting permanent custody to MCCS. After reviewing the record, we agree with the trial court.

**{¶ 39}** The first factor is the child's interaction with its parents, foster caregivers, and others who may significantly affect the child. R.C. 2151.414(D)(1)(a). In this regard, the court considered the very strong bond between N.M. and the foster parents, who had taken care of N.M. since two days after her birth, other than the month that the child was in O.C.'s custody. The child was thriving and doing extremely well in her foster home. In addition, the foster parents had expressed a desire to adopt the child.

**{¶ 40}** The court noted that Mother had a bond with N.M. and had consistently visited her, but also commented on Mother's inappropriate responses to the child's behavior, Mother's unreasonable behavioral expectations, Mother's passivity and inability to pick up on N.M.'s cues, as described by Dr. Lilley, and the child's lesser bond with Mother. The court, therefore, found that this factor weighed in favor of giving custody to the agency. There is clear and convincing evidence in the record to support these conclusions.

**{¶ 41}** The court did note the testimony of the GAL, who recommended that Mother be given legal custody, but the court gave more weight to other testimony. Trial courts

are not required to follow recommendations of a guardian ad litem. *Bomberger-Cronin v. Cronin*, 2d Dist. Greene No. 2014-CA-4, 2014-Ohio-2302, ¶ 27. "As the fact finder, the trial court determines the guardian ad litem's credibility and the weight to be given to the guardian ad litem's recommendation. Because assessment of the credibility and weight of the evidence is reserved for the trial court, we will not second guess the court's decision to disregard the guardian ad litem's recommendation." (Citations omitted.) *Lumley v. Lumley*, 10th Dist. Franklin No. 09AP-556, 2009-Ohio-6992, ¶ 46.

{¶ 42} The second factor is the wishes of the child. R.C. 2151.414(D)(1)(b). The trial court disregarded this factor due to N.M.'s young age, and this was appropriate.

{¶ 43} Under R.C. 2151.414(D)(1)(c), courts are to consider a child's custodial history. In connection with this factor, the trial court noted that N.M. had been in the agency's custody and the care of the foster family virtually her entire life. The court weighed this factor in favor of granting permanent custody. Again, the record contains clear and convincing evidence to support this finding.

{¶ 44} The fourth factor is "the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." Concerning this factor, the court noted that both available extensions of temporary custody had been used, that N.M. had been in the agency's custody most of her life, and that N.M. had been in foster care for 36 months, with all but one month in the care of her current foster family. The court concluded that the child was "in desperate need of a legally secure placement." Decision and Judgment Concerning Objections to the Decision of the Magistrate, Doc. #5, p. 9.

{¶ 45} In this regard, Mother argues that the evidence indicated that she could

safely parent her child. Father argues that both parents had completed case plan objectives, and that while no motion was pending for custody to Father, custody to Mother remained a viable option. We disagree, for the reasons discussed earlier. In addition, we note that Father did not complete his case plan. At the time of the hearing, Father had no income and had not obtained stable housing. He was still living with the paternal grandmother, in an environment that had resulted in many police calls for domestic disturbances that involved not only Mother, but the paternal grandmother as well.

{¶ 46} The trial court found that none of the factors in R.C. 2151.414(E)(7)-(11) applied, and there is no dispute about this. Because clear and convincing evidence supports the trial court's decision, Mother's First Assignment of Error, and the portion of Father's sole assignment of error directed towards clear and convincing evidence, are overruled.

## B. Manifest Weight of the Evidence

{¶ 47} Under her assignment of error pertaining to manifest weight of the evidence, Mother argues that she completed her case plan, and that concerns about her future ability to parent are based on speculation. Father argues that the court's decisions on the various factors in R.C. 2151.414(D) are against the manifest weight of the evidence.

{¶ 48} "A trial court's decision on termination 'will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established.' " *In re N.C.*, 2d Dist. Montgomery No. 26611, 2015-Ohio-2969, ¶ 15, quoting *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. Furthermore, as was already noted, we defer to the

trial court concerning credibility issues and weight to be given to the evidence in view of the trial court's better opportunity to view the witnesses and assess credibility. *In re A.J.S.*, 2d Dist. Miami No.2007-CA-2, 2007-Ohio-3433, at ¶ 22.

{¶ 49} In view of our discussion on the clear and convincing evidence supporting the judgment, we conclude that arguments about the manifest weight of the evidence are also without merit. Contrary to Mother's arguments, she did not successfully complete her case plan. Although Mother participated in the activities outlined by the agency, she was unable to demonstrate that she comprehended the information that was presented. This was not speculation about the future; mother could not adequately parent at present. As was noted earlier, while the GAL recommended custody to Mother, the trial court found other witnesses more credible. Furthermore, Father did not even substantially complete his case plan, and no witness supported reunification with Father.

{¶ 50} For the reasons stated, Mother's Second Assignment of Error and the remainder of Father's sole Assignment of Error are overruled.


### III. Reasonable Efforts Determination

{¶ 51} Mother's Third Assignment of Error states that:

The Trial Court Erred When It Found that the Agency Had Made Reasonable Efforts to Reunify the Family.

{¶ 52} Under this assignment of error, Mother contends that MCCS never attempted to reunify Mother and N.M., and that this lack of effort persisted throughout the case. After reviewing the record, we disagree.

{¶ 53} " 'Reasonable efforts means that a children's services agency must act

diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15, 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. " 'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." (Citation omitted.) *In re K.M.*, 12th Dist. Butler No. CA 2004-02-052, 2004-Ohio-4152, ¶ 23. *Accord In re C.O.*, 2d Dist. Montgomery No. 26610, 2015-Ohio-4290, ¶ 43.

{¶ 54} We have also defined "reasonable efforts" as "a good faith effort which is 'an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage.' The issue is not whether [the Agency] could have done more, but whether it did enough to satisfy the 'reasonableness' standard under the statute." *In re S.F.*, 2d Dist. Montgomery No. 25318, 2013-Ohio-508, ¶ 21, quoting *In re Secrest*, 2d Dist. Montgomery No. 19377, 2002-Ohio-7096, ¶ 13.

{¶ 55} There is no indication that MCCS failed to make reasonable efforts. After filing motions for permanent custody, MCCS acquiesced in two extensions of temporary custody so that the parents could continue to work on the case plan. *See* Magistrate's Decision and Judge's Order Granting a First Extension of Temporary Custody, Doc. #134, p. 1; and Magistrate's Decision and Judge's Order Granting a Second Extension of Temporary Custody, Doc. #85, p. 1 (both noting agreement as to the extension of temporary custody).

{¶ 56} MCCS provided substantial case services to the parents over a period of more than two years, including parenting and psychological assessments, visitation, and

referrals to parenting classes, domestic violence education, and counseling for anger management. The MCCS caseworker testified that "[w]e have offered [Mother] every service they have, some twice, to try and help facilitate her ability to reunify safely with the child, and while she has cooperated and participated in any and all services we have asked her to do, she has not been able to – to assimilate the material and demonstrate that she understands what needs to be done to safely parent this child because of her own developmental delays." Transcript of Proceedings, Vol. I, p. 100.

{¶ 57} Mother contends that MCCS did not provide her with sufficient opportunity to develop and practice her parenting skills because her parenting time was limited initially to four hours per week and then later to two hours per week. However, Mother was permitted unrestricted contact with N.M. when the child was placed in the custody of Mother's cousin. When the child was removed from the cousin's care, she suffered from ringworm, thrush, a yeast infection, and rock-hard stools from having had mashed potatoes put in her formula. The atmosphere in the cousin's home also included drug use, domestic violence, and many calls to the police. More importantly, despite significant intervention and assistance thereafter, Mother was never able to demonstrate that she could safely and independently care for the child, nor did Mother alleviate concerns about domestic violence. Under the circumstances, MCCS did not act unreasonably in requiring limited and supervised visitation.

{¶ 58} Accordingly, Mother's Third Assignment of Error is without merit and is overruled.

IV. Conclusion

{¶ 59} All of Mother's assignments of error, and Father's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Ann M. Graber
Marcy A. Vonderwell
Kate L. Bowling
Daryle Tibbs
J.T.
Hon. Anthony Capizzi