[Cite as *In re E.A.J.R.*, 2021-Ohio-4505.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

| | |
|---|---|
| IN RE: E.A.J.R. and R.P.R. | : |
| | : |
| | :     Appellate Case No. 2021-CA-24 |
| | : |
| | :     Trial Court Case Nos. 2019-C-00030- |
| | :     0C, 0D and 2019-C-00031-0C, 0D |
| | : |
| | :     (Appeal from Common Pleas Court- |
| | :     Juvenile Division) |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of December, 2021.

. . . . . . . . . . .

MARCY A. VONDERWELL, Atty. Reg. No. 0078311, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 61 Greene Street, Suite 200, Xenia, Ohio 45385
    Attorney for Appellee, Greene County Children Services

FRANK MATHEW BATZ, Atty. Reg. No. 0093817, 126 North Philadelphia Street, Dayton, Ohio 45403
    Attorney for Appellant, Father

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Father appeals from a judgment of the Greene County Court of Common Pleas, Juvenile Division, which terminated his parental rights and granted permanent custody of his two-year old son, E.A.J.R., and his three-year-old son, R.P.R., to Greene County Children Services ("GCCS"). For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On November 15, 2019, GCCS received a report of domestic violence between the parents of E.A.J.R. and R.P.R. ("Mother" and "Father"). The report indicated that as a result of the domestic violence, Mother engaged in self-harm in front of the children and threatened to commit suicide. The report also indicated that Mother was not practicing safe sleep with E.A.J.R. and was feeding E.A.J.R. whole grapes when he was only six months old. In light of the report, GCCS filed a neglect and dependency complaint on November 18, 2019, that requested the trial court to grant GCCS temporary custody of E.A.J.R. and R.P.R. The trial court then held a shelter care hearing and granted GCCS interim temporary custody of the children.

{¶ 3} On January 15, 2020, the matter proceeded to an adjudication and disposition hearing. During the hearing, GCCS made an oral motion to withdraw the neglect allegation from the complaint. The trial court found the motion well taken and dismissed the neglect allegation with prejudice. The hearing then proceeded solely on the dependency allegation. Following the hearing, the trial court found that the children were dependent and that GCCS had made reasonable efforts to prevent the children's

removal from their home. Accordingly, the trial court granted GCCS temporary custody of E.A.J.R. and R.P.R.

{¶ 4} After receiving temporary custody of the children, GCCS developed amended case plans for Mother and Father. The case plans included objectives for Mother and Father to complete in order to reunify them with the children. There is no dispute that Mother eventually abandoned the children and was removed from her case plan. Father, however, maintained contact with GCCS and continued to work on his case plan. Some of Father's case plan objectives were to engage in mental health and substance abuse counseling, complete a psychological assessment with a parenting evaluation, comply with his probation, and obtain safe, stable housing.

{¶ 5} On October 5, 2020, GCCS moved the trial court to have its temporary custody of the children extended. The trial court granted GCCS's motion on November 5, 2020, and extended GCCS's temporary custody as requested. Three months later, Father overdosed on drugs and was hospitalized for approximately two days. After Father's overdose, GCCS filed a motion to modify its temporary custody to permanent custody. In the motion, GCCS indicated that it was requesting permanent custody of E.A.J.R. and R.P.R. due to ongoing concerns about Father's mental health, stability, and inability to maintain housing. On April 27, 2021, Father filed a motion opposing GCCS's motion for permanent custody and a motion requesting the trial court to award him custody of the children.

{¶ 6} To address these motions, the trial court held a permanent custody hearing on May 28, 2021. During the permanent custody hearing, the State presented testimony from the psychologist who evaluated Father, Dr. Gordon Harris. The State also

presented testimony from the visitation coordinator at the Greene County Visitation Center, Libby Powers; GCCS supervisor, Sarah Cooley; GCCS caseworkers Michelle Allen and Tabitha Clary; and the foster mother who had been caring for E.A.J.R. and R.P.R. The children's guardian ad litem ("GAL") also made a brief statement at the hearing and filed two reports containing her custody recommendation. The following is a summary of the testimony and evidence that was presented to the trial court.

### Dr. Gordon Harris

{¶ 7} Dr. Harris is a licensed clinical psychologist whose practice focuses on psychological testing and psychotherapy with adults and children. Dr. Harris testified that he evaluated Father on August 28, 2020, and September 29, 2020, and thereafter prepared a report of his findings. To evaluate Father, Dr. Harris interviewed Father and performed several psychological tests, including the Minnesota Multiphasic Personality Inventory, Millon Clinical Multiaxial Inventory, Rorschach Inkblot Test, and the Parenting Satisfaction Scale.

{¶ 8} Based on his testing and interactions with Father, Dr. Harris testified that Father was very resistant to listening to any advice and to taking any help. Dr. Harris also testified that Father had substance abuse issues that Father either did not recognize or was not willing to address. Dr. Harris further testified that Father was rather contradictory and self-defeating at times.

{¶ 9} During his testimony, Dr. Harris identified the report of his findings, which was admitted into evidence as State's Exhibit No. 1. Dr. Harris testified that his report stated that Father might someday be able to parent at a minimally acceptable level if

Father stopped abusing substances and engaged in intensive psychological help, which included taking medication. Dr. Harris, however, testified that Father rejected any such help.

{¶ 10} Dr. Harris also testified that, given Father's distorted thinking and inability to recognize his responsibilities as a parent, Father was more likely to mistreat his children through negligence than through physical abuse. Dr. Harris explained that Father was chronically unable to deal with stressors in his life and that Father would function adequately only if he could successfully eliminate those stressors. Dr. Harris, however, testified that it was unlikely that Father would be able to eliminate his stressors and be able to appropriately parent his children in the foreseeable future.

*Libby Powers*

{¶ 11} Powers was the visitation coordinator at the Greene County Visitation Center ("visitation center"). Powers testified that in December 2019, she had an intake appointment with Father after Father's case was referred to the visitation center by GCCS. Powers explained that she initially declined to provide visitation services to Father due to certain statements Father made during the intake appointment. Specifically, Powers testified that Father had stated that "he would kill anyone who got in the way of him getting his children back." Trans. (May 28, 2021), p. 37.

{¶ 12} Powers testified that after she denied Father services at the visitation center, Father's GCCS case worker, Michelle Allen, approached her in September 2020 and asked if she would be willing to consider another referral for Father's case. Powers explained that Allen had told her that Allen had been monitoring Father for several months

and assured her that Father was not a safety concern. Powers testified that she agreed to give Father another chance and scheduled him for a second intake appointment. Powers testified that there were no problems with the second intake appointment and that Father thereafter began using the visitation center to visit his children in November 2020.

{¶ 13} Powers, however, testified that throughout April 2021, Father had problems following the visitation center's policies. For example, Powers testified that while visiting his children, Father had talked about his case, said negative things about his caseworker, and engaged the visitation monitor in conversation. Powers also testified that she had had security concerns about Father because Father would get angry and escalate when the visitation staff would ask him to abide by the center's policies.

{¶ 14} Powers testified that on April 28, 2021, Father had a visit during which she personally reminded Father of the center's policies. Powers claimed that Father responded by telling her "to remove [herself] from his visit and to mind [herself]." Trans. (May 28, 2021), p. 39. Based on that interaction, and based on Father continually talking to the monitor, raising his voice, getting agitated when asked to follow the center's policies, and allowing his children to have contact with an unauthorized individual during a visitation, Powers decided to terminate visitation services for Father.

{¶ 15} Powers testified that on April 30, 2021, she filed a report with the trial court to terminate Father's visitation services at the center. During her testimony, Powers identified the report, which was admitted into evidence as State's Exhibit No. 2. The report summarized the negative behavior exhibited by Father during his visits between April 22 and 30, 2021. Father's negative behavior included making derogatory remarks about the other parent/family, initiating adult conversation topics, using foul language,

making promises regarding future visitation and living arrangements, engaging staff in detailed non-emergency conversations, disrespecting staff, ignoring staff's requests or directives, and being confrontational with staff.

*Sarah Cooley*

{¶ 16} Cooley was a supervisor at GCCS who oversaw caseworkers. Cooley testified that Father's case was assigned to caseworker Jennifer Otto in May 2019, and that Father had an active case plan at that time. Cooley testified that in November 2019, GCCS received information that Mother had cuts on her arms, was making threats of suicide, and was not providing for E.A.J.R. and R.P.R. Because of concerns of domestic violence between Mother and Father, and due to Mother and Father's not providing for the children, Cooley testified that GCCS filed a neglect and dependency complaint.

{¶ 17} Cooley testified that, at the time the neglect and dependency complaint was filed, Mother and Father had been living together in an apartment with E.A.J.R. and R.P.R. Cooley testified that Father was eventually trespassed from the apartment because he was not on the lease and thereafter became homeless. Cooley testified that Mother subsequently lost the apartment, became homeless herself, and began disengaging with GCCS.

{¶ 18} Cooley testified that Father's case was transferred to caseworker Michelle Allen in January 2020. Cooley testified that Father's case plan at that time included objectives for him to obtain safe and stable housing, provide for the children, engage in mental health and substance abuse treatment, and to complete a parenting and psychological evaluation.

{¶ 19} Cooley testified that GCCS decided to file for permanent custody of E.A.J.R. and R.P.R. in February 2021. According to Cooley, this decision was based on Father's instability, failure to obtain housing, and due to Father's recently overdosing on drugs. Cooley testified that after GCCS filed for permanent custody, Father moved into an apartment in Xenia, Ohio, with his current girlfriend and her three children. Cooley also testified that Father received income in the form of social security disability benefits.

{¶ 20} During her testimony, Cooley explained that her concerns with Father's parenting include the allegations of domestic violence between Mother and Father, Father's escalating when getting angry, and Father's making threatening statements such as "[GCCS agents] would be leaving in body bags" if they came out to his home. Trans. (May 28, 2021), p. 66.

*Michelle Allen*

{¶ 21} Allen was the GCCS caseworker assigned to Father's case at the time of the hearing. Allen testified that while working with Father on his case plan, Father was arrested in February 2020 for being intoxicated and resisting arrest. Allen testified that Father was put on probation for the February incident and was thereafter arrested again in July 2020, for a similar incident of intoxication and resisting arrest. Allen testified that Father's probation was continued after his second arrest.

{¶ 22} With regard to Father's case plan, Allen testified that it included an objective for Father to maintain safe, stable housing. According to Allen, Father had not made progress on this objective. Allen testified that Father resided with his parents in early 2020, but later moved to a homeless shelter and then to a hotel. Allen testified that after

his July 2020 arrest, Father had resided in The Meadows Apartment Complex in Xenia, Ohio. Allen testified that in August 2020, Father reported living in a different apartment complex, and also continued to live with his parents intermittently. Allen testified that as of March 2021, Father had been living with his then-girlfriend and her three children in a two-bedroom apartment. To Allen's knowledge, Father was not listed on the apartment's lease.

{¶ 23} Allen indicated that she had attempted to help Father obtain housing by meeting with him in January 2020 for purposes of filling out a Greene County Metropolitan Housing Authority ("GMHA") application. Allen also indicated that she had met with Father in the fall of 2020 for the same purpose since the GMHA application form had changed. Allen claimed that she had advised Father about what documentation he needed in order to complete the GMHA application—specifically, an identification card and a social security card. Allen testified that she worked with Father on getting both of those items.

{¶ 24} Allen testified that Father had been able to get his identification card, but never obtained his social security card. Allen testified that she provided Father with an application for a social security card and told Father that she would help him complete the application and mail the application in for him once he completed it. Father, however, never provided Allen with the completed application. Therefore, Allen indicated that Father still did not have a social security card and had been unable to apply for GMHA housing. According to Allen, Father had made no progress on the GMHA application.

{¶ 25} Concerning visitation, Allen testified that Father had started visitation with E.A.J.R. and R.P.R. in January 2020, but that visitation was halted due to the COVID-19

pandemic. Allen testified that Father was eventually referred back to the visitation center in November 2020, and that Father regularly attended visits until he was discharged from the visitation center in April 2021. Allen explained that Father had been discharged from the visitation center because he had failed to comply with the center's policies. Allen testified that Father had since attended two, one-hour video visits with his children.

{¶ 26} With regard to mental health services, Allen testified that Father's case plan required him to engage in mental health treatment in order to work on coping with stress, anger management, and substance abuse. Allen testified that Father had engaged in mental health services at DeCoach, TCN, and Fairborn Mental Health. Allen testified that Father had followed through with his counseling services and had completed all the required psychological and substance abuse assessments. Allen testified, however, that Father continued to state that he did not have any mental health concerns.

{¶ 27} Allen also discussed Father's drug overdose, which occurred on February 9, 2021. Allen testified that on February 10, 2021, a member of Father's family had contacted her and advised her that Father was in the hospital and unresponsive. Allen testified that Father had contacted her on February 12, 2021, after he woke up and was discharged from the Intensive Care Unit. According to Allen, Father told her that he had had an allergic reaction to his prescription medication. However, Allen testified that when she asked Father if he took the appropriate amount of his medication, Father admitted to taking 300 pills or a month's worth of his medication in an attempt to commit suicide. Allen testified that Father later claimed his overdose was a way for him to make a statement about not wanting to be on medication.

{¶ 28} Allen recalled that when she discussed with Father the concern that his

overdose presented for his mental health and stability case plan objectives, Father stated that "he would be in his grave" before permanent custody of his children was granted to GCCS. Trans. (May 28, 2021), p. 87. Allen also claimed that Father continued to deny having any mental health concerns. Allen testified that Father was arrested following his overdose due to violating his probation, and that Father's probation ended in March 2021, after he served a jail sentence.

{¶ 29} During her testimony, Allen explained that Father's drug overdose and his statements following the overdose indicated that Father's mental health treatment had not been effective and that Father was not making progress toward the goal of emotional stability. Therefore, Allen testified that she had continuing concerns about Father's safety.

{¶ 30} Allen testified that GCCS decided to file for permanent custody of E.A.J.R. and R.P.R. a few weeks after Father's overdose; this decision was ultimately based on Father's making no progress on his housing objective for over a year, showing no progress on the goals of being able to cope with stress even while receiving mental health services, being arrested twice while under the influence, attempting to commit suicide, and due to GCCS's having no other means to help Father.

{¶ 31} Allen testified that after GCCS filed for permanent custody, Father became more and more agitated and expressed more and more anger toward GCCS. Specifically, Allen testified that Father made violent comments such as "I should have shot all of them coming through the door" when discussing the caseworkers and police officers who had removed his children. Trans. (May 28, 2021), p. 97. Allen also testified that Father stated that if GCCS established permanent custody of his children "he would

turn Xenia into World War III." *Id.* at 98. Allen further recalled several weeks where every telephone conversation with Father ended with him yelling at her and hanging up the phone.

{¶ 32} With regard to Mother, Allen testified that in early 2020, Mother requested to be removed from the case plan involving E.A.J.R. and R.P.R. because Mother was moving to Kentucky to be with her older children. Allen testified that Mother then contacted her a few months later in April 2020 and indicated that she wanted to get back on the case plan in an effort to reunify with E.A.J.R. and R.P.R. Allen testified that she thereafter worked toward putting Mother back on the case plan by having Mother enter services in Kentucky. Allen testified, however, that she was unable to fully provide out-of-state services for Mother and that Mother was unable to make any progress on her case plan. According to Allen, Mother did not have any housing, did not enter any treatment services, was unable to visit the children due to the COVID-19 pandemic, and maintained only minimal contact with GCCS. Allen testified that once the COVID-19 restrictions were lifted at the visitation center, Mother visited the children once a month in July, August, and September 2020, but Mother had had no contact with E.A.J.R. and R.P.R. since September 2020.

{¶ 33} Allen testified that Mother was removed from the case plan in December 2020. Since that time, Mother had made only intermittent contact with GCCS in order to receive general updates on E.A.J.R. and R.P.R. Allen testified that when she advised Mother that GCCS was filing for permanent custody of E.A.J.R. and R.P.R., Mother indicated that she was in favor of GCCS obtaining permanent custody. Allen testified that Mother believed she lacked the stability to successfully reunify with the children.

Allen also testified that Mother believed that reunifying the children with Father would not be in the children's best interest. Allen further testified that Mother did not want the children to be reunified with Father due to Father's history of domestic violence and due to her concern that Father might physically abuse the children. Allen indicated that Mother was also concerned about Father's lack of stability.

{¶ 34} Continuing, Allen testified that GCCS researched potential relative placements for E.A.J.R. and R.P.R. Specifically, Allen testified that the children's paternal grandmother had been investigated, but was found to have a disqualifying charge in her history that involved sexual contact with a minor. Allen testified that GCCS had also considered the children's paternal grandfather, but discovered extensive concerns with him in their database. Allen testified that she told the paternal grandfather that he still could come in for fingerprinting and they would attempt a home study, but the paternal grandfather never followed through with having his fingerprints taken.

{¶ 35} Allen also testified that Mother suggested her sister as a possible placement option. Allen testified that she told Mother to have her sister contact GCCS, but the sister never made contact. Allen testified that she investigated Mother's sister and discovered that the sister had a children services case that had recently been closed and marked as being a case that involved a high risk of future harm with concerns of physical abuse. For that reason, Allen testified that Mother's sister would not have been an appropriate placement option for the children.

{¶ 36} Allen testified that E.A.J.R. and R.P.R had been with the same foster family since January 2020. Allen testified that the foster family had expressed its ability and willingness to adopt E.A.J.R. and R.P.R. Therefore, Allen testified that, if GCCS was

granted permanent custody of the children, GCCS would likely pursue adoption with the foster family. Allen concluded her testimony by stating her belief that permanent custody in favor of GCCS was in E.A.J.R. and R.P.R.'s best interest.

*Tabitha Clary*

{¶ 37} Clary was an intake caseworker at GCCS who was assigned to a case involving Father's girlfriend at the time of the hearing, N.M. Clary testified that N.M. then resided at an apartment complex in Xenia, Ohio, called The Meadows. Clary also testified that N.M. reported living in the apartment with her three children and the father of her youngest child.

{¶ 38} Concerning Father, Clary testified that it had been reported to her that Father had overdosed in N.M.'s apartment. After Clary investigated the matter, N.M. reported that Father had not overdosed in her apartment, but in her mother's apartment located upstairs. Although N.M. initially told Clary that Father was just a friend, Clary testified that N.M. later stated that she and Father were in a relationship.

{¶ 39} Clary testified that she first met with Father at N.M.'s apartment in April 2021. During that visit, Father told Clary that there was no reason he should not have custody of his children and that there should be no issue with him residing in N.M.'s apartment. Clary testified that Father talked at length about wanting to harm the people who had initially removed his children. Clary also testified that she had observed aggressive behavior from Father in that he screamed and yelled and was unable to regulate his emotions.

{¶ 40} Clary testified that she had met Father a second time at N.M.'s apartment

in May 2021. According to Clary, this meeting was due to GCCS's receiving a photograph showing Father and N.M. in possession of a marijuana pipe and a bag of marijuana while N.M.'s children were present. Clary testified that it was her understanding that Father had a prescription for medicinal marijuana.

{¶ 41} Clary testified that GCCS had a case open for N.M. at the time of the hearing and that there were concerns regarding domestic violence between N.M. and the father of one of her children. Clary testified that there were also concerns regarding Father living with N.M. given his substance abuse. Clary testified that she was in the process of filing for protective supervision of N.M.'s children.

*Foster Mother*

{¶ 42} E.A.J.R. and R.P.R.'s foster mother ("Foster Mother") testified that both boys had been in her care since January 2020. Foster Mother testified that the boys had been doing great in her home and that they had no significant or atypical behavioral issues. Foster Mother testified that when the boys did exhibit behavioral issues, the issues occurred right after a visit with Father. Specifically, Foster Mother testified that after visiting with Father, the boys became distressed and more defiant than usual. However, Foster Mother testified that this behavior usually resolved fairly quickly.

{¶ 43} Foster Mother testified that when the COVID-19 restrictions were lifted and visitation resumed, R.P.R. started telling her that he did not want to go to visits and would get sad ahead of the scheduled visits. Foster Mother testified that during the most recent video visit with Father, R.P.R. sat in the corner of the kitchen with his head down looking sad and totally withdrawn. According to Foster Mother, R.P.R. was not engaged in

conversation with Father.

{¶ 44} Foster Mother testified that there were five other children living in her home. Foster Mother testified that the five children were connected to E.A.J.R. and R.P.R., had unique relationships with them, and loved them deeply. Foster Mother testified that if GCCS were granted permanent custody of E.A.J.R. and R.P.R., she would seek to adopt them. Foster Mother testified that she would be willing to allow contact between Father and E.A.J.R. and R.P.R. if she deemed it beneficial for the children.

*GAL*

{¶ 45} The GAL filed reports on April 8 and 26, 2021, which contained her custody recommendation. In her reports, the GAL noted that Father had not secured safe and stable housing. The GAL also noted that E.A.J.R. and R.P.R. were thriving in their foster placement. At the hearing, the GAL added that she had no doubt that Father cared deeply for E.A.J.R. and R.P.R. but stated that she had ongoing concerns for the children's stability given their young age. As a result, the GAL recommended that permanent custody be granted to GCCS.

*The Trial Court's Decision*

{¶ 46} After considering the testimony and evidence presented at the permanent custody hearing, the trial court granted GCCS's motion for permanent custody and terminated Father and Mother's parental rights. The trial court also dismissed Father's motion for custody of the children. Father now appeals from that judgment, raising two assignments of error for review.

**First Assignment of Error**

**{¶ 47}** Under his first assignment of error, Father contends that the trial court erred by granting GCCS permanent custody of E.A.J.R. and R.P.R.   Specifically, Father claims that the trial court abused its discretion when it found that granting permanent custody to GCCS was in the best interest of the children.   We disagree.

**{¶ 48}** R.C. 2151.414 governs the termination of parental rights in Ohio.   Section (B)(1) of that statute provides a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public services agency.   The statute requires the trial court to find by clear and convincing evidence that: (1) an award of permanent custody to the agency is in the child's best interest; and (2) any one of the factors enumerated in R.C. 2151.414(B)(1)(a)-(e) exist.

**{¶ 49}** Father concedes that the second part of the two-part test was satisfied; the factor under R.C. 2151.414(B)(1)(d) applied to E.A.J.R. and R.P.R., as both children had "been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period."   R.C. 2151.414(B)(1)(d).   Therefore, Father only challenges the trial court's finding that permanent custody in favor of GCCS was in E.A.J.R. and R.P.R.'s best interest.

**{¶ 50}** When making the best-interest determination, R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors, including but not limited to the following:

    (a)    The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and

(e) Whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

R.C. 2151.414(D)(1)(a)-(e).

{¶ 51} The trial court's findings under R.C. 2151.414(D)(1) must be supported by clear and convincing evidence. *In re K.W.*, 2d Dist. Clark No. 2013-CA-107, 2014-Ohio-4606, ¶ 7. "Clear and convincing evidence" is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986).

{¶ 52} "The [trial] court's decision to terminate parental rights * * * will not be overturned * * * if the record contains competent, credible evidence by which the court

could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. "On review, we give the trial court's final determination 'the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.' " *In the Matter of G.B.*, 2d Dist. Greene No. 2017-CA-30, 2017-Ohio-8759, ¶ 8, quoting *In re Alfrey*, 2d Dist. Clark No. 2001-CA-83, 2003-Ohio-608, ¶ 102. Accordingly, the trial court's decision will not be reversed absent an abuse of discretion. *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (applying abuse-of-discretion standard to trial court's findings under R.C. 2151.414).

{¶ 53} In making its best-interest determination, the trial court considered the relevant factors under R.C. 2151.414(D)(1) and made the following findings from the testimony and evidence presented at the permanent custody hearing.

*(a) Children's Interaction and Interrelationship with Parents, Siblings, and Foster Parents*

{¶ 54} The trial court found that the E.A.J.R.'s and R.P.R.'s relationships with their Mother and Father were detrimental to them. Specifically concerning Father, the trial court found that the testimony of the GCCS caseworkers revealed that E.A.J.R. and R.P.R. could not be returned to Father's care due to his: (1) lack of safe, stable housing; (2) February 2021 drug overdose and suicide attempt; (3) inability to engage in treatment; (4) inability to demonstrate what he learned in treatment; and (5) lack of anger control.

{¶ 55} The trial court also found that Father had not established a relationship or

healthy bond with the children due to their young age and due to the children's being in foster care for approximately 20 months.   The trial court further found that E.A.J.R. and R.P.R. had primarily resided in the same foster home since November 2019, and that they had integrated well with the other children in that household.

{¶ 56} The trial court found that there were no other relationships relevant to this factor given that E.A.J.R. and R.P.R. did not have relationships with any other family members.   The trial court noted that the children's paternal grandmother was not an appropriate legal custodian due to her having a past disqualifying offense, being on probation for domestic violence against Mother, and being unable to successfully pass a home study.

*(b) Wishes of the Children*

{¶ 57} The trial court found that E.A.J.R. and R.P.R. were too young to express their wishes as to custody.   The trial court also noted that the GAL recommended that permanent custody of the children be granted to GCCS.

*(c) Custodial History of the Children*

{¶ 58} The trial court found that E.A.J.R. and R.P.R. were removed from Mother and Father's custody in November 2019.   The trial court found that Father had engaged in visitation with E.A.J.R. and R.P.R. since their removal, but noted that the visitation center had terminated services for Father in April 2021, due to Fathers continually failing to follow the visitation center's policies and becoming angry and having aggressive outbursts when the visitation staff addressed his behavior.   The trial court found that

although Father had had contact with E.A.J.R. and R.P.R., he was not exhibiting any of the skills taught through counseling or implementing any of the changes that need to take place in order for him to have a healthy relationship with his children. The trial court further noted that Father had not resided with E.A.J.R. and R.P.R. since November 2019.

*(d) Children's Need for Legally Secure Permanent Placement*

**{¶ 59}** The trial court found that a legally secure permanent placement for E.A.J.R. and R.P.R. could not be achieved without granting permanent custody to GCCS. In so holding, the trial court found that Father had been unable to demonstrate skills learned in treatment, did not recognize the role he played in the children's removal from his care, and did not have safe, stable housing.

**{¶ 60}** With regard to housing, the trial court found that Father had lived in a number of different locations since November 2019 and was not on the lease of his current residence. The trial court further found that Father had failed to complete the necessary forms to apply for GMHA's housing program despite GCCS's offering to assist him in doing so.

**{¶ 61}** Regarding Father's behavior, the trial court found that Father's February 2021 overdose and his multiple encounters with police were concerning. The trial court also referred to the concerns expressed by Dr. Harris, i.e., that E.A.J.R. and R.P.R. would be vulnerable in Father's custody if Father went without medication and ongoing psychological treatment. The trial court found that the children's young age would prevent them from being able to protect themselves and from being able to report concerns about Father.

*(e) Factors Under R.C. 2151.414(E)(7)-(11)*

{¶ 62} The trial court made no findings under the factors set forth in R.C. 29151.414(E)(7) through (11), as none of those factors applied to Father.

{¶ 63} Upon review, we find that there was clear and convincing evidence in the record to support all of the trial court's best-interest findings under R.C. 2151.414(D)(1). Because those findings were supported by competent, credible evidence, and because they weighed in favor of finding that it was in the best interest of the children to grant GCCS permanent custody, we do not find that the trial court's decision to award GCCS permanent custody was an abuse of discretion.

{¶ 64} Father's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 65} Under his second assignment of error, Father contends that GCCS failed to make reasonable efforts to reunify him with E.A.J.R. and R.P.R.   We disagree.

{¶ 66} "The Supreme Court of Ohio has held that, 'except for a few narrowly defined exceptions, the state must have made reasonable efforts to reunify the family prior to the termination of parental rights.' "  *In re A.T.,* 2d Dist. Montgomery Nos. 28332, 28355, 2019-Ohio-3527, ¶ 73, quoting *C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 21.   "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time."  *C.F.* at ¶ 43.

{¶ 67} " ' "Reasonable efforts means that a children's services agency must act

diligently and provide services appropriate to the family's need * * * as a predicate to reunification." ' " *In re N.M.*, 2d Dist. Montgomery Nos. 26693, 26719, 2016-Ohio-318, ¶ 53, quoting *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15, 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. We have also described "reasonable efforts" as " 'a good faith effort which is "an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage." ' " *In re Secrest*, 2d Dist. Montgomery No. 19377, 2002-Ohio-7096, ¶ 13, quoting *In re Cranford*, 2d Dist. Montgomery Nos. 17085, 17105, 1998 WL 412454, *4 (July 24, 1998), quoting *In re Weaver*, 79 Ohio App.3d 59, 606 N.E.2d 1011 (12th Dist.1992).

{¶ 68} We stress that " ' "[r]easonable efforts" does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible.' " *In re N.M.* at ¶ 53, quoting *In re K.M.*, 12th Dist. Butler No. CA 2004-02-052, 2004-Ohio-4152, ¶ 23. " 'The issue is not whether [the agency] could have done more, but whether it did enough to satisfy the "reasonableness" standard under the statute.' " *Secrest* at ¶ 13, quoting *In re Smith*, 2d Dist. Miami No. 2001-CA-54, 2002 WL 538888, *6 (April 12, 2002).

{¶ 69} In this case, the trial court found, and we agree, that GCCS made reasonable efforts to reunify Father with E.A.J.R. and R.P.R. The record establishes that GCCS developed a case plan for Father that included various objectives for reunification. The record also establishes that GCCS maintained contact with Father and worked to help Father complete his case plan objectives. Specifically, GCCS made referrals for mental health services and psychological evaluations, facilitated Father's visitation with

his children at the visitation center, and tried to help Father secure suitable housing.

{¶ 70} With regard to visitation, the record establishes that Father was initially declined services at the visitation center due to certain statements Father made at his initial intake interview. GCCS caseworker Allen thereafter approached the visitation coordinator and asked her to give Father another chance. The record indicates that Allen went out of her way to assure the visitation coordinator that Father was not a safety concern. As a result of Allen's efforts, Father was able to visit his children at the visitation center until services were terminated for Father's failing to abide by the center's policies.

{¶ 71} Concerning housing, the record establishes that GCCS provided Father with an application for GMHA's public housing program. The record also indicates that caseworker Allen offered to assist Father in completing the GMHA application and advised Father on what documentation he needed in order to complete the application. As part of that process, the record indicates that Allen obtained forms for Father to apply for a social security card and even offered to mail in the forms for Father once he completed them. However, Father never provided the completed forms to Allen and never followed through with the GMHA housing application.

{¶ 72} Although it does not relate to Father, we note that GCCS also attempted to work with Mother on her case plan even when Mother was residing out of state. The record also indicates that GCCS researched multiple relative placement options, but found no willing and appropriate relatives with whom the children could be placed.

{¶ 73} Upon review, we find that GCCS acted diligently and provided appropriate, helpful services to Father. The actions taken by GCCS exhibited an honest, purposeful effort to reunite Father with E.A.J.R. and R.P.R. Therefore, contrary to Father's claim

otherwise, we find that the record supports the trial court's finding that GCCS made reasonable efforts toward reunifying Father with his children.

{¶ 74} Father's second assignment of error is overruled.

## Conclusion

{¶ 75} Having overruled both assignments of error raised by Father, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


TUCKER, P.J. and EPLEY, J., concur.


Copies sent to:

Marcy A. Vonderwell
Frank Mathew Batz
J.B.
Jenny Roether, GAL
Hon. Amy H. Lewis