[Cite as *In re L.R.*, 2024-Ohio-5592.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| IN RE: L.R., S.R., A.R., A.R., O.R. | : | |
| | : | |
| | : | C.A. No. 30113 |
| | : | |
| | : | Trial Court Case Nos. C-2021-002547-0U; C-2021-002550-0S; C-2021-002552-0V; C-2021-002548-0V; C-2021-002551-0V |
| | : | |
| | : | |
| | : | |
| | : | (Appeal from Common Pleas Court-Juvenile Division) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 27, 2024

. . . . . . . . . . .

DAWN S. GARRETT, Attorney for Appellant

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Father, M.H., appeals from judgments of the Montgomery County Court of Common Pleas, Juvenile Division, which granted the motions of Montgomery County Department of Job and Family Services, Children Services Division (MCDJFS) for

permanent custody of his four minor children, S.R., A.R.1, A.R.2, and O.R. For the following reasons, the trial court's judgments will be affirmed.

## I. Facts and Procedural History

{¶ 2} According to the complaint, MCDJFS became involved on June 16, 2021, after Dayon police officers were dispatched to Mother and Father's home to conduct a welfare check. Five children were living in the home – L.R. (born May 2009), A.R.2 (born November 2010), O.R. (born December 2013), A.R.1 (born September 2016), and S.R. (born March 2019). M.H. is the father of all the children except L.R.

{¶ 3} When police officers arrived, they saw several children run back into the home and close the door. It was apparent that the children had not bathed in days, and one officer saw two-year-old S.R. in a full cloth diaper, roaming in the street. Father told an officer that the children were fine; he indicated that they had food, water, and electricity in the home and that he and Mother both worked, but they found it difficult to care for five children. When the officers entered the home, they noticed an "overwhelming odor of rotted food and filth." Open food and flies were "everywhere." Ceiling tiles were falling, exposing the inside of the roof, which was also filled with flies. The floor was covered with dirt and apparent feces, and there were piles of trash and clothing throughout the home. After MCDJFS arrived, Mother and Father became uncooperative. Father ultimately was arrested and charged with child endangering, obstructing official business, and resisting arrest.

{¶ 4} Mother and the children were transported to Dayton Children's Hospital so the children could be evaluated. All the children were very dirty, and several had multiple

bruises, as well as lice, bed bug bites, and rashes. O.R. reported that Father had hit him with a paddle. A.R.2 had a partially shaved head. Mother was arrested at the hospital and charged with child endangering. The Dayton police gave MCDJFS emergency custody of the children.

{¶ 5} The following day, MCDJFS filed complaints in juvenile court, alleging that the children were abused, neglected, and dependent and requesting temporary custody. The complaint noted that Mother had five other children who had previously been removed from her care; MCDJFS had permanent custody of three of those children, and the other two were in the care of their paternal grandfather.

{¶ 6} A shelter care hearing was held regarding the five children, and MCDJFS was granted interim temporary custody of the children. A case plan was developed for Mother and Father to facilitate reunification of the family. The case plan included the following general objectives: (1) participate in mental health assessments and follow all recommendations; (2) ensure the children participate in mental health assessments and follow all recommendations; (3) obtain and maintain safe and clean housing that is appropriate for a family of seven; (4) ensure the children attend school daily and on time, and participate in their education; (5) refrain from engaging in excessive forms of discipline techniques; (6) ensure the children receive all appropriate and necessary medical and dental care; (7) ensure the children maintain appropriate hygiene; (8) obtain and maintain employment and provide verification; (9) sign all releases of information requested by the agency; (10) attend weekly visits; and (11) attend scheduled court hearings and comply with court orders. Both parents refused to sign the case plan.

{¶ 7} On September 9, 2021, after a hearing before a magistrate, the children were adjudicated as dependent, neglected, and abused. On October 4, 2021, after a separate dispositional hearing, the magistrate granted temporary custody to the agency. The decision was immediately adopted by the trial court. Mother and Father objected to the magistrate's decision, but the objections were overruled on April 13, 2022.

{¶ 8} The next day (April 14, 2022), Mother moved to have the case transferred to a different juvenile court judge. She stated that the assigned judge had been her attorney when she previously had a case involving MCDJFS. On May 2, 2022, the court overruled the motion to transfer. While acknowledging that he previously had represented Mother, the judge reasoned that he "withdrew from his prior representation more than twelve years ago and, consequently, has no personal knowledge of any facts relevant to the pending matters. Accordingly, the Court finds that Mother has failed to raise a reasonable question as to [the judge's] impartiality or to demonstrate any bias or other cause for his removal in the pending cases."

{¶ 9} On May 10, 2022, MCDJFS moved for permanent custody of the children. A trial before the magistrate was originally scheduled for August 30, 2022, but it was continued several times. On February 2, 2023, the children (through their own attorney) moved for legal custody to be granted to their mother.

{¶ 10} At trial on February 13, 2023, the magistrate heard testimony from L.R.'s foster mother; Andrea Wilson, the ongoing caseworker for Mother and Father from August 2021 until September 2022; Barbara Rehmert, the ongoing caseworker since September 2022; and both parents. On March 21, 2023, the magistrate granted permanent custody

to MCDJFS and denied the children's motion. She concluded that the children could not be placed with their parents within a reasonable time and that permanent custody to MCDJFS was in the children's best interests. The magistrate found that the children had not been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. The trial court adopted the magistrate's decision, and Mother and Father timely objected.

{¶ 11} On February 26, 2024, the trial court overruled Mother and Father's objections and granted permanent custody to MCDJFS. It agreed with the magistrate's conclusions and further found that the agency had made reasonable efforts to eliminate the continued removal of the children or to make it possible for the children to return home safely.

{¶ 12} Father appeals from the trial court's judgment, raising two assignments of error. He claims that (1) the trial court's grant of permanent custody to MCDJFS was based on insufficient evidence and against the manifest weight of the evidence, and (2) the trial court erred in denying the motion to transfer the case to another judge.

## II. Relevant Legal Standards

{¶ 13} The United States Supreme Court has described parents' interest in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Unless they forfeit the right through specific conduct, "suitable" parents have a "paramount" right to the custody of their minor children. *In re Perales*, 52 Ohio St.2d 89, 97 (1977). This interest, however, is not absolute. "The state has broad authority to

intervene to protect children from abuse and neglect." *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Prob. Div.*, 2016-Ohio-7382, ¶ 58 (O'Connor, C.J., dissenting).

{¶ 14} When a child is adjudicated abused, neglected, or dependent, the juvenile court may elect from several possible dispositions, including committing the child to the temporary custody of a public child services agency. R.C. 2151.353(A)(2)(b). If a children services agency with temporary custody later moves for permanent custody, the trial court may grant that request in accordance with R.C. 2151.414. R.C. 2151.353(C); *see* R.C. 2151.413(A)

{¶ 15} R.C. 2151.414 sets forth a two-part analysis for courts to consider when determining a motion for permanent custody to a public services agency. First, the trial court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with the parent within a reasonable time; (b) is abandoned; (c) is orphaned with no relatives to take permanent custody; (d) has been in the temporary custody of a public or private children services agency for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the parent's custody has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1).

{¶ 16} Here, the trial court found by clear and convincing evidence that R.C. 2151.414(B)(1)(a) applied. Under R.C. 2151.414(E), this finding can be made if the court finds that any one of 16 listed factors exists. *In re D.L.W.*, 2024-Ohio-3032, ¶ 18. These factors include:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home . . .

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to [R.C. 2151.414(A)] or for the purposes of [R.C. 2151.353(A)(4)].

R.C. 2151.414(E)(1) and (2).

{¶ 17} If the first prong is met, the court must then determine whether granting permanent custody is in the best interest of the child. *In re J.N.*, 2020-Ohio-4157, ¶ 26 (2d Dist.); R.C. 2151.414(B)(1). To help with this determination, R.C. 2151.414(D)(1) sets out factors the court must consider:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

"No one element is given greater weight or heightened significance." *In re C.F.*, 2007-Ohio-1104, ¶ 57.

{¶ 18} Because awarding permanent custody is a "drastic remedy that involves the termination of parental rights, permanent custody determinations must be based upon clear and convincing evidence." (Citations omitted.) *In re J.N.* at ¶ 25. "Clear and convincing" means more than a preponderance, but less than "clear and unequivocal." *In re Rose*, 2017-Ohio-694, ¶ 19 (2d Dist.). Further, because R.C. 2151.414 mandates that a juvenile court find by clear and convincing evidence that the statutory requirements are met, the sufficiency of the evidence and/or manifest weight standards of review are the proper appellate standards of review, depending on the arguments presented by the parties. *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

{¶ 19} When an appellate court reviews whether the lower court's permanent custody decision is against the manifest weight of the evidence, it "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and

a new trial ordered." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001); *In re Z.C.* at ¶ 14.

{¶ 20} " 'Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a [judgment] is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.' " *In re Adoption of L.B.R.*, 2019-Ohio-3001, ¶ 19 (2d Dist.), quoting *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). Consequently, "a determination that a [judgment] is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Id.*, quoting *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

### III. Review of the Permanent Custody Decision

{¶ 21} In his first assignment of error, Father asserts that the trial court erred in determining that the children could not be placed with him within a reasonable time and that permanent custody to MCDJFS was not in his children's best interests. He further argues that MCDJFS did not make adequate efforts to reunite him with his children. Father also summarily challenges the case plan requirement that he undergo a psychological assessment, but he provides no argument on this issue, and we will not address it. *See* App.R. 16(A)(7).

### A. Reunification within Reasonable Time under R.C. 2151.414(B)(1)(a)

{¶ 22} The trial court found that the children could not or should not be reunited with Father within a reasonable time. In reaching this conclusion, it determined that Father had failed continuously and repeatedly to substantially remedy the conditions causing his children to be placed outside his home. This conclusion was neither based

on insufficient evidence nor against the manifest weight of the evidence.

{¶ 23} Caseworker Andrea Wilson testified that MCDJEF became involved with the family on June 16, 2021, when the police were called to Father and Mother's home. The children were found to be wandering unsupervised and were dirty. When officers went inside the home, the conditions were "deplorable" with extensive issues with insects and feces. After the children were taken to the hospital, they were found to have lice infestations, bruises, and cuts.

{¶ 24} A case plan was developed for Mother and Father with identical objectives. According to Wilson and Barbara Rehmert (who followed Wilson as the family's caseworker), the plan included that they (1) undergo a parenting and psychological evaluation and follow all recommendations; (2) address the issues with the family's housing; (3) ensure the children attended school; (4) maintain and verify employment and income; (5) address concerns regarding the children's medical care; (6) sign all releases of information requested by the agency; (7) cooperate with service providers; and (8) attend weekly visitation with the children.

{¶ 25} Both parents refused to sign the case plan. Wilson became the caseworker in August 2021, and she attempted to speak with Father about the case plan monthly. He was regularly uncooperative. Wilson testified that the parents "did not want to do anything on the case plan." Rather, Father accused her of stealing the children and asserted that MCDJFS had had no right to take them. Wilson described their interactions as hostile and said that Father frequently would not allow her to talk; "He would just continuously interrogate me."

{¶ 26} When Rehmert became the caseworker in October 2022, she went to Mother and Father's home to discuss the case plan. Rehmert similarly described Father as "very hostile" and uncooperative. She stated that Father "kept wanting to talk about the beginning of the case and how this all came about, how his constitutional rights were violated and that he was technically under duress, even meeting me there at his home that day because he didn't consent to any of this or Children Service involvement." Rehmert testified that Father was unwilling to discuss the case plan when she first met him due to his being very argumentative and hostile, and that never changed.

{¶ 27} Wilson explained that the parenting and psychological assessment was part of the case plan because the parents had significant issues with neglecting the children. Specifically, medical appointments were not up to date, the children were not in school or were not attending, they were severely infested with lice, and some children reported and showed signs of physical abuse. However, Wilson never made any referral to assist Father in meeting the requirement that he undergo a parenting and psychological assessment. She explained that she spoke with Father every time they met about completing the evaluations, but he refused to sign releases, which prevented her making a referral. When Wilson last spoke with Father in August 2022, he told her that he would not comply with anything.

{¶ 28} Father was similarly uncooperative with Rehmert. When she tried to discuss the parenting and psychological assessment with him, he would say that he wanted everyone at MCDJFS to take the assessment because they were not fit to determine whether "he needs a head examination." Rehmert also explained to Father

why the agency needed a release of information to make a referral, but Father continued to insist he did not need to sign one. Rehmert's most recent attempt to ask Father to complete a parenting and psychological evaluation was a week before the permanent custody hearing; Father "became very explosive, combative, and refused and told [Rehmert] that it's under duress." Rehmert expressed concern that Father has mental health issues that he needs to address.

{¶ 29} Throughout the case, Mother's and Father's parenting time schedule was once per week for two hours. The parents had been consistent with their visitation, and both Wilson and Rehmert had observed several visits. While watching via a camera, Wilson heard Father tell the children that he needed their help and to tell the agency that they wanted to come home. When Wilson observed in person, Father was hostile, argued, and made a scene with her.

{¶ 30} Wilson made a referral for a visitation assessment, but the evaluator informed Wilson that the parents were not able to handle the children and that Wilson needed to be there for the assessment. After the assessment was completed, the report mentioned concerns that Father was discussing the case with the children. He asked, for example, "what have we ever done to you?" "have we ever hurt you, harmed you?" and "who do you want to live with?" The report also indicated that Father got upset and agitated with the youngest two children, yelling and cursing at them, and that he left them alone in the room by themselves. Because of the assessment, parenting time was not increased.

{¶ 31} Rehmert testified that she had not observed any major concerns about

Mother and Father's interaction with their children, but she found the family as a whole to be "very disengaged." She explained that for more than half the visit, they are all "doing their own thing" and not interacting.

{¶ 32} Father verified employment with Wilson during the summer of 2022. Wilson did not have concerns about the parents' income. However, Father refused to tell Rehmert where he worked and what his income was.

{¶ 33} Wilson acknowledged that the agency did not always notify Mother and Father timely about their children's school appointments. She indicated, however, that when they were made aware, "there were some issues with that as well." For the most part, the parents did not attend.

{¶ 34} The condition of the home was a significant concern that led to the removal of the children. Father and Mother resided together in the same home throughout the case. During a visit in October 2021, the parents were loud and "very oppositional," and Wilson stated that she saw "just a little bit" of the home. There were "a bunch of couches and chairs covered with some sheets and everything else," but it was dark inside and she was not allowed in. Wilson could not address the appropriateness of the home during that visit. When she mentioned the issue of roaches and bed bugs, Father replied that everyone on his block had them and "Are you going to remove their kids, too?" When Wilson informed her supervisor about the home visit, she was instructed not to return and to meet with the parents at the agency.

{¶ 35} Wilson did return to the home with the guardian ad litem in May 2022, and she was allowed inside. The parents pointed to repairs to the walls and ceiling. Wilson

observed multiple animals: five lizards, fish tanks, dogs, cats, and a litter of kittens. She found the carpets to be "very soiled" and that, at some point, they had been "pretty bad with feces"; her feet stuck to the carpet. Father explained the stickiness, saying that the children had learned to make slime. (The children had been out of the home for nearly a year at that point.) The home smelled strongly of dander and animals, the kitchen was grimy, there were flies in the kitchen, and roaches were seen in the dining room.

**{¶ 36}** When Wilson saw the home again in July 2022, it was in the same condition. Wilson again noted the condition of the carpet, the flies, and the smell. She also saw that the inside of the refrigerator was "pretty bad" with excrement from bugs. Wilson went into the home's basement, where there was a huge pile of things in the middle; the basement had water and smelled of mold and mildew. When Wilson went into the home again in August 2022, nothing had changed. At some point, Wilson had gone into the bedrooms and found them furnished.

**{¶ 37}** When Rehmert visited the residence in October 2022, she observed that it was very dark and cluttered. She noted multiple aquariums and reptile cages in the living room and a dog. The carpets were very soiled, and the home needed a "good washing-down." The home had an odor of animal feces. She did not, however, see flies or insects, and the kitchen was "fairly clean"; Rehmert did not open the refrigerator or go into the basement. Rehmert saw that the bedrooms had beds, bedding, and clothing.

**{¶ 38}** Rehmert again saw the interior of the home in February 2023, shortly before the permanent custody hearing. The home was in a similar condition as in October 2022, but it smelled heavily of animal urine. When Rehmert asked Mother about bed bugs,

Mother indicated she had used a home remedy every month to get rid of them. Rehmert did not inspect the mattresses for bed bugs.

{¶ 39} Neither Wilson nor Rehmert made referrals regarding housing. Rehmert stated, however, that she had spoken with Mother about applying for income-based housing if the landlord refused to resolve issues with the residence. When asked what services the agency had provided for the family, Wilson and Rehmert both responded that it had provided information and referral services, case management, home study, and substitute care/foster placement.

{¶ 40} Mother and Father presented a different version of events. Mother testified that she had cooperated with MCDJFS. She acknowledged that she had not done everything that MCDJFS asked, but she stated that she did not understand how the agency had arrived at its determinations. Discussing the parenting and psychological evaluation, Mother stated that she did not understand why she needed go back on medication, do anger management classes, and take parenting classes. Mother testified that she would cooperate and work on the recommendations if that was necessary to get her children back.

{¶ 41} With respect to the condition of the home, Mother stated that she had lived there with Father for four years. She explained that the carpet had been there since the 40s and that it was soiled from years of use. Mother did not smell urine in February 2023 and denied the carpet was sticky. Mother had spoken to the landlord about replacing the carpet when they first moved in, and the landlord agreed. The landlord was replacing the carpet in other homes, and Mother was told, "I'll get to you when I get to you." Mother

testified that the house was good enough for the children to live in.

{¶ 42} Mother denied that bed bugs had ever been an issue in the home. She testified that the bites were from rolling around in the grass three days before the children's removal. She stated that they can easily pick up bed bugs from her riding the bus and Father's having a job in maintenance, but they treat the house every two weeks. Mother acknowledged seeing roaches, but she indicated that they had treated for them with boric acid. Mother stated that she had never received a referral to legal aid for assistance with substandard housing.

{¶ 43} Mother testified that she had verified her employment with the caseworkers, visited her children consistently, and signed a release of information. She worked full-time on third shift and had received promotions, and she stated Father worked full-time during the day. Mother indicated that she never actually signed a release for a psychological evaluation; the release was for records from Miami Valley Hospital. Mother stated that the children were taken five days after she had been in hit by a car and that her twin brother died by suicide in October 2021.

{¶ 44} Mother further pointed out that much of the case occurred during the COVID-19 pandemic, which resulted in the children being "cooped up together." It also affected the children's schooling, as some of the children were going to school remotely.

{¶ 45} Father testified that he had resided in the home for four or five years with Mother. He similarly testified that he had spoken with the landlord about replacing the carpet, but he had no control over that. When asked about animals in the home, Father indicated that they had one dog. When asked about other types of animals, Father

acknowledged that he had three cats, five reptiles, and fish in four aquariums.

{¶ 46} Father said that he was employed as a maintenance man at a property. He had been there for approximately six months, but he had been employed throughout the pendency of the case. He stated that he had sufficient income to meet the children's needs.

{¶ 47} When asked about schooling, Father indicated that they had a lot of trouble with "computer school stuff" during the pandemic. At that time, the youngest two children were too young for school.

{¶ 48} Father testified that he visited with the children two hours per week and had never missed a visit. He described the visits as "mostly good. Sometimes there are hiccups." He said they eat dinner during visitations and sometimes give the children toys. They cannot go outside, but they do "all kinds of stuff. Sometimes they do play on their phones." Father expressed that he was bonded with his children and wanted them to return home. When asked on cross-examination about the "hiccups," Father stated that the two youngest children do not know who mom and dad are and who to listen to anymore. He said, "They throw big fits." Father acknowledged that it is difficult to control five children.

{¶ 49} Father admitted that Rehmert had discussed his completing a parenting and psychological evaluation, but he indicated that he was "not really" willing to do it. He explained that he felt like he was being forced to do it and he did not think it was something someone should be forced to do. He also did not believe it was scientific, and he thought "[w]hatever evaluation they do, they're going to want to try to put me on some kind of

drug." Father said that he was "pretty depressed" from his children being taken away, but he did not need drugs. Father stated he would complete an evaluation if that was the only way he could get his children back. But he also thought that "it's never going to end. What is being asked of us is never going to end. It's always going to change, and they're going to add stuff onto it. I'm not willing to go through that." Father stated that he would continue his children's medical and counseling if they were getting a benefit from it, but he wanted to be involved in the choices.

{¶ 50} When asked if he had a criminal history, Father replied, "Not really." He indicated he had had a "domestic" with his first wife about 20 years earlier. Father had no prior cases with MCDJFS. Father had other children, who were adults, and he had "mostly" raised them. Father testified that he was ready to resume parenting his children ("I always was."), and that he believed that was in his children's best interests.

{¶ 51} On this record, there was substantial support for the trial court's conclusion that Father had continuously and repeatedly failed to remedy the conditions that caused his children's removal. The children's removal was primarily based on the deplorable condition of the family's home and the findings during the medical examination at Dayton Children's Hospital, which reflected both abuse and neglect. Father did not appear to recognize the severity of the problems that caused the children's removal. He was consistently hostile and combative with the caseworkers, even on such matters as verifying his employment and income with Rehmert (which, apparently, he could have done). Father refused to take any action on the case plan. Most notably, Father repeatedly refused to undergo a parenting and psychological assessment, which was a

component of the case plan due to the parents' significant issues with neglecting the children. Father expressed at the permanent custody hearing that he would be willing to complete the parenting and psychological evaluation to get his children back, but he felt he was being forced to do so and expressed an unwillingness to comply with the recommendations that would result from the evaluation. In short, Father took no steps to remedy the apparent neglect and abuse, and his testimony reflected an unwillingness to do so within a reasonable time.

{¶ 52} We recognize that Father complied with some portions of the case plan. He regularly visited with the children, although the caseworkers had some concerns about the family's interactions. Wilson and Rehmert noted improvements in the home's condition, particularly some interior repairs and a significant reduction in the flies and other insects in the home. However, the home's condition continued to raise concerns, as reflected by the condition of the carpet and the strong odor of animal urine. There was no update on the basement, which had water and smelled of mold and mildew, and the home remained cluttered with multiple animals. Father had full-time employment, as did Mother, but Father refused to verify his employment with Rehmert. Viewing the record as a whole, we cannot conclude that the trial court's finding under R.C. 2151.414(E)(1) was based on insufficient evidence or against the manifest weight of the evidence.

{¶ 53} The trial court further concluded, under R.C. 2151.414(E)(2), that Father had a chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that was so severe that it made Father

unable to provide an adequate permanent home for the children at the time of the hearing and within one year. Because the trial court must only find one factor under R.C. 2151.414(E), we need not address this additional basis for finding that the children could not be returned to Father within a reasonable time.

**B. Best Interests of the Children**

{¶ 54} Father next challenges the trial court's determination that granting permanent custody of his children to MCDJFS was in the children's best interest.

*1. Interaction and Interrelationships of the Children*

{¶ 55} The trial court first considered the interaction and interrelationship of the children with their parents, siblings, and others. Most of the trial court's findings related to L.R., who is not Father's biological child. However, L.R.'s foster mother testified that she and her husband wished to adopt L.R., as well as his two youngest siblings, A.R.1 and S.R. The girls did not live with L.R.'s foster parents, but the foster parents had been visiting with them for a few weeks, including two weekends and overnight stays.

{¶ 56} Rehmert testified that Father's children had a bond with their parents, but she did not believe it was a strong or heathy one. In addition, there was evidence that, during visitation, Father tried to influence what the children told the agency. Although Father testified that he was bonded with the children and wanted them returned home, the evidence supported a conclusion that the relationship between the children and Father was not a healthy one.

*2. Wishes of the Children*

{¶ 57} There was no testimony regarding the wishes of Father's children.

However, the guardian ad litem submitted a report on November 14, 2022, which recommended permanent custody to MCDJFS.

### 3. Custodial History

{¶ 58} The children were removed from Father's care on June 17, 2021, and interim temporary custody was granted to the agency. MCDJFS received temporary custody on October 4, 2021. Since their removal, O.R. and A.R.2 had been in several placements, including a residential facility. A.R.1 and S.R. were placed together, but at the time of the hearing, they were not with L.R.'s foster parents, who were interested in adopting them (along with L.R.). The trial court found that the children had not been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period.

### 4. Need for Legally Secure Permanent Placement

{¶ 59} While the Ohio Revised Code does not define what a "legally secure permanent placement" is, Ohio courts have held that the phrase means "a safe, stable, consistent environment where a child's needs will be met." *In re D.P.*, 2024-Ohio-480, ¶ 32, quoting *In re K.M.*, 2023-Ohio-3203, ¶ 35 (4th Dist.). The record demonstrates Father would have a difficult time providing such an environment for his children.

{¶ 60} Both Wilson and Rehmert testified about the children's behavioral, medical, and mental health issues. Father's eldest child, A.R.2 (born November 2010), was in a residential facility (along with O.R.) for some time, and then moved to a foster home. In January 2023, after a visit with her parents, A.R.2 came back to the foster home and started packing. There was also an incident that month in which A.R.2 physically

attacked her foster mother during an argument, the police were called, and A.R.2 was taken to juvenile detention. Rehmert had to place A.R.2 elsewhere, and she was no longer in a foster-to-adopt placement.

{¶ 61} A.R.2 has some mental health issues, including PTSD, ADHD, and depression, for which she receives medication and psychiatric counseling. A.R.2 also has an IEP for developmental and intellectual delays. While Wilson was the caseworker, school was going fairly well. A.R.2 had since changed schools, but Rehmert had not heard of any problems. As for medical needs, A.R.2 saw an ear, nose, and throat doctor for issues with her ear.

{¶ 62} According to Wilson, O.R. (born December 2013) had significant behavioral concerns, including violent behaviors, and had been diagnosed with adjustment disorder and oppositional defiant disorder, for which he had been receiving counseling. He had several placements before being moved to a residential treatment center for six months, where he frequently needed to be restrained. He was then placed in a home with his sister, A.R.2., in February 2022. He remained there for approximately six months, but then "disrupted from that placement" and was hospitalized for suicidal ideations and aggressive behavior.

{¶ 63} When O.R. was discharged from the hospital at the end of September 2022 (after several weeks), he was placed in a foster home. O.R. continued to have behavioral issues there; he fought aggressively with other children in the home and attacked his foster mother, causing bruising and a sprained wrist. O.R. also attempted to run away from that home. After being rehospitalized, O.R. was placed in another

foster home, where he stayed for only two months due to his behavior. In late January or early February 2023, O.R. was disrupted from his foster home due to allegations that he had placed his penis in a four-year-old girl's mouth. On the date of the permanent custody hearing, O.R. was in respite care; Rehmert planned to place him in a different foster home the next day.

{¶ 64} O.R. had received schooling at the Warren County Educational Services Center, where he had an academic and behavioral IEP and received counseling services. Rehmert indicated that there was a safety plan at the school which stipulated that O.R. could not be alone with female students. Rehmert had recently received a report that O.R. was struggling behaviorally at school. She had scheduled O.R. for an updated psychological evaluation. Academically, O.R. had missed a significant amount of school and had learning delays. O.R. read at a kindergarten level.

{¶ 65} Rehmert mentioned that O.R. enjoys helping with chores and cooking. She stated that he does very well with structure.

{¶ 66} Wilson testified that A.R.1 (born September 2016) also exhibited violent behaviors with her sister (S.R.) and other children where she was placed. She also had behavioral issues at school and on the bus. Rehmert testified that A.R.1 continued to struggle behaviorally and had "pretty intense meltdowns" that can last 30 minutes or longer when she was punished or did not get her way.

{¶ 67} A.R.1 was diagnosed with specified trauma and stress-related disorder, and was receiving counseling, which occurred at her school. Being only six years old (as of the permanent custody hearing), A.R.1 was just beginning school, and it was going fairly

well. Rehmert indicated that the school wanted to do an IEP assessment. A.R.1 also had dental issues that required the removal of one or two teeth.

{¶ 68} S.R., the youngest (born March 2019), was placed with her sister, A.R.1, and Wilson stated that she displayed some of the behavior issues her sister displayed. Wilson was not aware of any diagnoses or services that S.R. required. Rehmert testified that S.R. was attending preschool and there were no major concerns. S.R. was "pretty hyper", and Rehmert anticipated that she would be assessed for ADHD or ADD.

{¶ 69} When the permanent custody hearing occurred, Father had not had the children under his full-time care for more than a year and a half. That was a concern to Rehmert, given several of the children's behavioral and mental health issues. Rehmert also expressed concern that Father had his own mental health issues that he needed to address.

{¶ 70} Testifying about the children's need for legally secure permanent placements, Wilson stated that she had explored alternative placement options. The parents had given her three names, none of which were viable. One person's phone number did not work, and another never called back. The third, who lived out of state, initially expressed interest, but Wilson could not reach her when she tried to call back. Wilson also ran a "clear search," sending out 40 letters without result. Rehmert stated that the parents had never given her names for seeking alternative placements, and since Wilson had done a clear search, Rehmert did not know what else she could do.

{¶ 71} When asked if she believed permanent custody was in the children's best interests, Wilson testified that the parents had not acknowledged there were issues and

had not addressed them. She further stated that there was a lot of hostility from the parents that the children had been exposed to and it was negatively affecting them. Rehmert further testified that permanent custody to MCDJFS was in the children's best interests. She cited the parents' failure to accept responsibility for why the children came into the agency's care, their failure to complete the case plan, the agency's mental health concerns regarding the parents, and the children's (except S.R.) developmental delays and behavioral issues. Rehmert testified that the primary barriers to reunification with Father were the housing concerns, Father's failure to complete the parenting and psychological evaluation, and failure to address mental health concerns.

{¶ 72} Father's testimony reflects his belief that he can adequately care for his children. He indicated that he would continue with the children's therapy and medication if he believed it was helping them. However, he refused to complete a parenting and psychological assessment as well as other portions of the case plan. The trial court could have reasonably concluded that, if the children were returned home, Father's parenting of the children would be no different than when the children were removed.

5. *Factors under R.C. 2151.414(E)(7)-(11)*

{¶ 73} The trial court found that none of the factors in R.C. 2151.414(E)(7)-(11) applied.

{¶ 74} Upon review, MCDJFS provided clear and convincing evidence that permanent custody to MCDJFS was in the children's best interests. The trial court's conclusion that permanent custody to MCDJFS was in the children's best interests was neither based on insufficient evidence nor against the manifest weight of the evidence.

**C. Reasonable Efforts to Reunite Family**

{¶ 75} Finally, Father asserts that MCDJFS did not make reasonable efforts to make it possible for the children to return home safely.   We disagree.

{¶ 76} "The Supreme Court of Ohio has held that, 'except for a few narrowly defined exceptions, the state must have made reasonable efforts to reunify the family prior to the termination of parental rights.' "   *In re A.T.*, 2019-Ohio-3527, ¶ 73 (2d Dist.), quoting *In re C.F.*, 2007-Ohio-1104, ¶ 21.   "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time."   *In re C.F.* at ¶ 43.

{¶ 77} "Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need . . . as a predicate to reunification."   (Citations omitted.)   *In re E.A.R.*, 2021-Ohio-4505, ¶ 67 (2d Dist.). " 'Reasonable efforts' does not mean all available efforts.   Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible."   *In re N.M.*, 2016-Ohio-318, ¶ 53 (2d Dist.), quoting *In re K.M.*, 2004-Ohio-4152, ¶ 23 (12th Dist.).

{¶ 78} We have also defined "reasonable efforts" as "a good faith effort which is 'an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage.'   The issue is not whether [the agency] could have done more, but whether it did enough to satisfy the 'reasonableness' standard under the statute."   *In re S.F.*, 2013-Ohio-508, ¶ 21 (2d Dist.), quoting *In re Secrest*, 2002-Ohio-7096, ¶ 13 (2d Dist.).

{¶ 79} There is no evidence that MCDJFS failed to make reasonable efforts. MCDJFS created a case plan for Father to assist the family with reunification, but he refused to sign it. The caseworkers repeatedly tried to engage with Father, but he was hostile and refused to work on the case plan. Wilson and Rehmert both testified that the agency had provided information and referral services, case management, home study, and substitute care/foster placement for the family. Father's continuous refusal to cooperate with MCDJFS prevented the agency from making referrals for Father and the family's interactions during visitation prevented additional parenting time with the children. On this record, the trial court's conclusion that MCDJFS made reasonable efforts to reunify the family was based on sufficient evidence and was not against the manifest weight of the evidence.

{¶ 80} Father's first assignment of error is overruled.

### IV. Refusal of Trial Judge to Recuse Himself

{¶ 81} In his second assignment of error, Father claims that the original trial judge erred when he failed to recuse himself after representing Mother in a prior juvenile court case involving MCDJFS. He further asserts that cumulative errors resulted in a denial of due process and warrant reversal.

{¶ 82} Father's assignment of error fails for several reasons. First, we note that Mother, not Father, had sought to have the case transferred to another juvenile court judge due to her prior association. Father did not ask the trial judge to recuse himself, nor did he assert in the trial court that he was prejudiced by the judge's prior representation of Mother. Accordingly, he has waived the issue for appeal.

{¶ 83} Second, neither Mother nor Father employed the correct procedure for disqualifying the trial judge who had represented Mother. R.C. 2701.03 sets forth the procedures for seeking disqualification of a common pleas court judge for prejudice. Under that statute, a party or the party's attorney may file an affidavit of disqualification with the clerk of the Supreme Court of Ohio. R.C. 2701.03(A). The affidavit must meet several requirements, as set forth in R.C. 2701.03(B). If a proper affidavit is submitted, the chief justice of the supreme court or his or her designee determines whether the trial judge is biased or prejudiced. R.C. 2701.03(D), (E); Ohio Constitution, Article IV, Section 5. The procedure in R.C. 2701.03 provides the exclusive means by which a party may claim that a common pleas judge is biased and prejudiced. *In re K.B.*, 2018-Ohio-3600, ¶ 21; *State v. Osie*, 2014-Ohio-2966, ¶ 62. "A court of appeals does not have authority to rule on the disqualification of the trial judge or to void a judgment of the trial court on that basis." *Easterling v. Hafer*, 2012-Ohio-2101, ¶ 9 (2d Dist.).

{¶ 84} Finally, Father has appealed from the trial court's judgment granting permanent custody of his children to MCDJFS, which was rendered in February 2024. By that time, the original trial judge had retired, and a new judge had been assigned to the case. In short, the judge about which Father complains did not render the judgment on appeal. Even if we could address Father's claim, we would find no basis to conclude that the original trial judge's failure to recuse himself was reversible error.

{¶ 85} Father further claims that cumulative errors warrant reversal. The cumulative error doctrine is typically raised in criminal cases following a trial. Under that doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial

deprives a defendant of a fair trial[,] even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 2012-Ohio-2577, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197 (1987). "However, in order even to consider whether 'cumulative' error is present, we would first have to find that multiple errors were committed." *State v. Madrigal*, 87 Ohio St.3d 378, 398 (2000); *State v. Mize*, 2022-Ohio-3163, ¶ 76 (2d Dist.). "We then must find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." *Mize* at ¶ 76, quoting *State v. Durant*, 2004-Ohio-6224, ¶ 38 (2d Dist.).

**{¶ 86}** Father has not identified multiple instances of harmless error, nor have we found a series of errors that would have changed the outcome of the case. The cumulative error doctrine does not apply.

**{¶ 87}** Father's second assignment of error is overruled.

## V. Conclusion

**{¶ 88}** The trial court's judgments will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and LEWIS, J., concur.